**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joseph NOCAR and John Pendergast,
Defendants-Appellants.**

**Nos. 73–1703, 73–1704.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 27, 1973.

Decided May 31, 1974.

Rehearing and Rehearing En Banc
Denied July 18, 1974.

Barry H. Holt, Thomas H. Ramsey, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Ann P. Sheldon, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* PELL, Circuit Judge, and NOLAND, District Judge.**

PELL, Circuit Judge.

On the basis of the parties' stipulated testimony, the trial judge found Joseph Nocar and John Pendergast guilty of knowingly and intentionally possessing a quantity of marijuana (18,772 grams) with intent to distribute the same, 21 U.S.C. § 841(a)(1).[1] Defendants raise

---

* Associate Justice Tom C. Clark, United States Supreme Court, Retired, is sitting by designation.

** Judge James E. Noland of the Southern District of Indiana is sitting by designation.

1. Subsection 841(a)(1), part of the Comprehensive Drug Abuse Prevention and Control Act of 1970, provides:

"Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. . . ."

21 U.S.C. § 802(6) defines "controlled substance" as a drug or other substance, or im-

three issues on this appeal: (1) whether the Attorney General failed to update and republish in the Federal Register the schedules of "controlled substances" as required by 21 U.S.C. § 812(a), and, if he did, whether that failure precluded the defendants' prosecutions for possession of marijuana;[2] (2) whether the court erred in denying the defendants' motion to suppress marijuana which had been seized in a warrantless search of an automobile; and (3) whether the evidence was sufficient to prove that defendants had knowingly possessed the drug with intent to distribute it.

The evidence to which the parties had stipulated consisted primarily of the testimony that Government witnesses had given at the hearing on the motion to suppress. In a memorandum opinion issued April 20, 1973, the district court denied the motion.

Customs agents Robert Smith and Thomas King provided the principal evidence for the Government. Smith testified that on January 7, 1972, he had received a telephone call from a reliable informant, who told him that two men and a woman driving a blue Toyota with a specified Texas license plate were in Chicago attempting to locate buyers for narcotics. The three persons supposedly were staying at a motel at a designated location on the north side of Chicago. After Smith verified that an automobile fitting the informant's description was at the motel, he and another agent maintained surveillance. From his post, Smith could see two men and a woman in the room to which the car's occupants had been assigned. A check by another agent revealed that the Toyota was registered to a M. Guerra and that Carol Guerra, the owner's daughter, was under indictment in Texas. In appearance, the woman in the motel room corresponded

with the description Smith received of Carol Guerra. The agents also learned that the automobile had recently been in Mexico.

Agent Smith next observed defendant Pendergast drive up to the motel, enter the trio's room, and engage in conversation with the group. The agents checked the registration on Pendergast's vehicle. They learned that the car was registered to Pendergast at a Carbondale, Illinois, address. "[O]ur St. Louis office . . . stated that Mr. Pendergast was known in that area as a dealer in marijuana." When the persons in the room left and went to a garage at the rear of 1203–5 North State Street, Government agents followed them. They saw the Toyota backed into the garage while the woman resembling Carol Guerra remained in the adjacent alley. Smith testified that the woman kept glancing up and down the alley and appeared, to Smith, to be acting as a lookout. After a brief period, the persons left the garage.

Later in the day, the agents returned with a search warrant to the garage but found no contraband.

The next day, Saturday, January 8th, customs agents placed the garage under surveillance. About 1:50 p. m., agents Smith and King saw Nocar and Pendergast walk down the alley behind State Street. Smith drove his automobile to the south end of the alley, where King got out and began walking north. King testified that as he walked past the garage, he saw the blue Toyota with Texas license plates backed up to the door of the garage, its rear about a foot or two inside the building. The trunk of the car was open, and the garage door had been pulled down to the level of the trunk lid. A rug had been draped over the area between the open trunk lid and the body of the Toyota. King testified

mediate precursor, included in schedule I, II, III, IV, or V, as established by sections 811 and 812.

2. On May 11, 1973, the district court denied defendants' motion to dismiss the indictment

because of the Attorney General's supposed failure to comply with the republication provision of the Comprehensive Drug Abuse Prevention and Control Act.

that the view provided by the angle formed by the garage door and the wall of the garage enabled him to look into the building as he passed. During the approximately fifteen seconds he was at this vantage point, King observed defendant Nocar remove some white bags from the trunk of the Toyota and hand them to Pendergast, who placed them in the back of the garage. After observing these actions, King continued walking until he was some yards north of the garage whereupon he turned and signaled to agent Smith.

On the signal, Smith drove up the alley and jumped from his automobile, shouting, "Federal officers." Smith entered the garage at the same time that King, with gun drawn, did. Meanwhile, one of the defendants had slammed shut the trunk of the Toyota. Several other agents then joined those in the garage. Smith testified that he asked Nocar to open the trunk, and that Nocar shrugged his shoulders and did so. Smith observed white plastic bags and vegetable material in the trunk. He also detected a strong odor of marijuana. He then told the defendants that they were under arrest and read them their rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A field test revealed the substance in the bags to be marijuana. By 2:15 p. m., the agents had searched the garage and had found two suitcases containing approximately 6000 grams of marijuana.

The defendants testified in their behalf at the suppression hearing. Their version of the search differed somewhat from that of the agents. For example, they claimed that they did not hear the announcement "Federal officers" and that agent Smith demanded, rather than requested, that Nocar open the trunk.[3]

I.

Defendants' first contention rests on their interpretation of 21 U.S.C. § 812(a), which provides in pertinent part:

"There are established five schedules of controlled substances, to be known as schedules I, II, III, IV, and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semiannual basis during the two-year period beginning one year after the date of enactment of this subchapter and shall be updated and republished on an annual basis thereafter."

Subchapter I of the Comprehensive Drug Abuse Prevention and Control Act of 1970 was enacted on October 27, 1970. Marijuana was listed in schedule I of the statute.

The defendants maintain that the schedules should have been first republished and updated on the initial anniversary date, October 27, 1971, and subsequently on April 27, 1972, six months later. There was no republication on October 27. The Director of the Bureau of Narcotics and Dangerous Drugs first expressly invoked section 812(a) and fully republished the schedules on May 12, 1972, 37 Fed.Reg. 9545 (1972):

"The Comprehensive Drug Abuse Prevention and Control Act of 1970, in section 202(a) (21 U.S.C. 812(a)), requires that the schedules of controlled substances established by that Act be updated and republished on a semiannual basis during the 2-year period beginning 1 year after the effective date of that Act. The effective date of that Act was October 27, 1970. Pursuant to the mandate of section

3. In its memorandum opinion on the motion to suppress, the district court found that Nocar had not freely and voluntarily consented to the search of the trunk. "There was conflicting testimony . . . as to whether Nocar was asked to open the trunk or ordered to do so. It is clear that Agent King entered the garage with his gun drawn. It is not unreasonable to infer that Nocar believed that he was in custody even before he was told that he was under arrest. . . . [T]he Government failed to meet its burden of proof on its consent theory."

202(a), therefore, the Director hereby orders the publication of the schedules of controlled substances as of April 27, 1972."

Actually, schedules had been published approximately a year earlier in the Federal Register but not apparently pursuant to the mandate of the Act. In 36 Fed.Reg. 4928 (March 13, 1971), the Director had published under the caption of "Notice of Proposed Rule Making" a comprehensive set of regulations implementing the Act. The regulations covered, *inter alia*, registration of manufacturers, labelling and packaging, quotas, records, and reports. Also included was Part 308, schedules of controlled substances established by the Act "as they are changed, updated, and republished from time to time . . . ."

In response to objections to and comments on the proposed regulations, various amendments were made and the regulations as revised were published in 36 Fed.Reg. 7776, on April 24, 1971. In the proposed regulations, code numbers were given to the various controlled substances. In the regulations as finally published the scope and function of the code numbers was defined. These numbers do not appear in the schedules of the Act.

We do not deem that the publication of the schedules in March and April of 1971 were either necessitated by or were in compliance with the updating-republication requirement of the Act but were merely a part of the overall implementing regulations for the Act.

■ We disagree with the defendants' reading of section 812(a). The second sentence of the provision does not require republication on October 27, 1971. Rather, it directs that that date be used to determine when, during the following two years, the six-month demarcations are to fall. Therefore, the first republication was due on April 27, 1972, eighteen months after the enactment of the subchapter and one half year after the first anniversary.

The meaning that the defendants ascribe to the section would be supported, not by the provision as presently written, but by, for example, "The schedules established by this section shall be updated and republished one year after the date of the enactment of this subchapter and every six months thereafter for two years."

■ Amicus curiae contends that the May 12th republication, stated to be effective as of April 27, 1972, violates due process because of its retroactivity. We need not reach this issue, for the rights of these defendants obviously were not infringed. Their alleged violation of the drug laws occurred in January 1972, when, as we held above, the Government's obligation to republish the schedules in accordance with section 812(a) had not yet ripened. The non-publication cases upon which the defendants rely, Hotch v. United States, 212 F.2d 280 (9th Cir. 1954), and Borak v. Biddle, 78 U.S.App.D.C. 374, 141 F.2d 278 (1944), are thus inapplicable.

In sum, in January 1972 there was a valid prohibition in force making unauthorized use of marijuana a crime.

■ The defendants also argue that even if there had been a timely republication it would not have been valid inasmuch as the Director of the Bureau of Narcotics and Dangerous Drugs caused the republication rather than the Attorney General, 21 U.S.C. § 811. This argument, of course, is disposed of by our holding that the republication requirement had not ripened as of the date of activities involved in the present case. However, we also note that in 28 U.S.C. § 510, Congress provided that the Attorney General may make such provisions as he considers appropriate to allow other officers, employees or agencies to perform any of his functions. 28 C.F.R. 0.-100 subdelegates the functions of the Attorney General under the Comprehensive Drug Abuse Prevention and Control Act to the Director of the Bureau of Narcotics and Dangerous Drugs.

## II.

The defendants claim that they do not quarrel with the holdings in Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), and Carroll v. United States, 267 U.S. 132, 149, 45 S.Ct. 280, 69 L.Ed. 543 (1925), upon which the trial court in part relied in denying the motion to suppress the marijuana seized from the automobile trunk. Their complaint is that the foundation of those cases, the existence of probable cause, was lacking in their case. The district court had concluded that "[t]he evidence clearly shows . . . that the agents had probable cause to believe that the Toyota contained contraband drugs."

As the defendants point out, the informer's tip, as recapitulated by agent Smith, did not describe the basis for the informer's assertion that the persons he mentioned were attempting to sell narcotics. However, we certainly cannot fault the agents for following up the tip. It clearly was superior to casual rumor. The confidential source had previously given information to Government agents about illicit heroin and hashish traffic, which tips had resulted in four seizures and an unspecified number of arrests and convictions. The tip consisted in part of detailed information that was readily verifiable by independent means. The agents investigated these specifics, and from their own observations confirmed the existence of the persons, the automobile, and the motel registration. The reports stemming from the tracing of the blue Toyota and Pendergast's car further enhanced the tip's credibility. Next, the agents saw Carol Guerra acting suspiciously in the alley behind the State Street garage on January 7th.

Despite these corroborative indicia, the defendants contend that the fruitless search conducted on January 7th would have persuaded a reasonable person that the tip was probably inaccurate. The lack of contraband in the garage on Friday surely did not mandate the agents' abandoning their investigation. They had ample justification for keeping a watch on the garage the following day. During that surveillance, agent King saw defendant Nocar take white plastic bags from the Toyota's trunk and hand them to defendant Pendergast. Although King testified that he could not ascertain what substance was in the bags, we think it judicially cognizable that marijuana is often transported in bags. The covert garage activities smacked of the illegal activity customarily associated with drug transactions.

■ What agent King observed and the slamming of the trunk lid upon Smith's shout of "Federal officers" were the last needed corroboration of the informer's tip to create probable cause. Carroll, supra at 149, explains that term as "a belief, reasonably arising out of circumstances known to the seizing officer, that an automobile . . . contains that which by law is subject to seizure and destruction," a definition applicable to the instant case, too. "[T]he facts and circumstances within [the agents'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that intoxicating liquor was being transported in the automobile which they stopped and searched." Id. at 162. The evidence at the hearing was sufficient to meet the test the Supreme Court has stated in a related context: "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause . . . ." Spinelli v. United States, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1959). The agents here had many more facts on which to rely than had the agents in Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1969), which defendants cite. Contrast also Coolidge v. New Hampshire, 403 U.S. 443, 458–464, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971).

Not only was there probable cause, but the search of the Toyota and the seizure of the marijuana were not "unreasonable." It was not practicable for the

agents to try to obtain a search warrant before conducting the search. The defendants emphasize that the Federal Building was a mere mile and one half from the garage, but they minimize the difficulty of finding a magistrate on a Saturday afternoon without risking the loss of the possible contraband. The magistrate is present there on Saturdays only until noon. If the hunt for a magistrate and the warrant procedures had taken several hours, the defendants would now be arguing that the agents had violated their constitutional rights by preventing them from leaving the scene. Further, the Government would face a similar challenge had Carol Guerra or the unidentified male in the motel room or another person come to remove the Toyota. See Chambers v. Maroney, *supra* at 52, where the Court explained that

> "[f]or constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment."

### III.

The defendants' final argument is that the Government failed to prove the statutory elements of possession and intent to distribute.

Agent King testified that when he walked by the garage on the afternoon of January 8th he saw defendant Nocar removing some white bags from the trunk of the blue Toyota and handing them to defendant Pendergast. He also observed Pendergast take the bags and move them to the rear of the garage. King then signaled to agent Smith, and the men moved in to make the seizure. This testimony shows that the defendants had actual possession of the marijuana. That one of the defendants slammed the trunk shut when he realized that the agents were near does not negate the defendants' exercise of dominion and control over the marijuana immediately prior to the arrest. Because of King's observations, the Government did not need to establish that the defendants owned or leased the garage or the automobile or the suitcases.

The defendants also maintain that the agent's observations and the quantity of the contraband recovered are the only evidence the Government adduced as to their intent to distribute or sell and that such evidence was insufficient to meet the statutory requirement. Direct evidence of a sale or of the dollar value of drugs is not essential. As courts have frequently pointed out, knowledge and intent must often be proven by circumstantial evidence. At least two circuits, the Fifth and the Eighth, have held that proof of possession of substantial amounts of controlled substances supports the inference that the possessor intended to distribute the drugs rather than retain them for personal use. In United States v. Mather, 465 F.2d 1035 (5th Cir. 1972), cert. denied, 409 U.S. 1085, 93 S.Ct. 685, 34 L. Ed.2d 672 (1973), the defendant was carrying 197 grams of cocaine when he was arrested. In United States v. Perry, 480 F.2d 147 (5th Cir. 1973), the defendant possessed 188 pounds of hashish, and in United States v. Johnson, 469 F.2d 973, 977 (5th Cir. 1972), the amount was 133 pounds of marijuana. Citing *Mather*, the court in United States v. Echols, 477 F.2d 37 (8th Cir. 1973), cert. denied, 414 U.S. 825, 94 S. Ct. 128, 38 L.Ed.2d 58, held that the possession of 199 grams of cocaine was sufficient to support an inference of intent to distribute. Here, defendants possessed 18,770 grams, approximately 40 pounds, of marijuana.

We agree with the Fifth and Eight Circuits. *Cf.* United States v. Ortiz, 445 F.2d 1100, 1104–1105 (10th Cir. 1971), cert. denied, 404 U.S. 993, 92 S.Ct. 541, 30 L.Ed.2d 545; United States v. Cerrito, 413 F.2d 1270 (7th Cir. 1969), cert. denied, 396 U.S. 1004, 90 S.Ct.

554, 24 L.Ed.2d 495 (1970). It is consistent with House Report No. 91–1444, which accompanied H.R. 18583, the basis for the present Act: "The quantity of a drug found in the possession of a person, of course, bears upon the question of whether or not his possession is for his own use, or is for the purpose of illicit transactions involving others, for which much more severe penalties are provided." 3 U.S.Code Cong. & Admin. News, 91st Cong., 2d Sess. (1970)–1971), at 4577.

We therefore affirm the judgments of conviction of *Joseph Nocar* and *John Pendergast.*

Affirmed.