**UNITED STATES of America,**
**Plaintiff–Respondent,**

v.

**Michael C. HOVEY,**
**Defendant–Petitioner.**

**Crim. A. No. 86–2.**

United States District Court,
D. Delaware.

Nov. 24, 1987.

Richard J. McMahon, Asst. Atty. Gen., Dept. of Justice, Wilmington, Del., for plaintiff-respondent.

Robert T. Aulgur of Whittington & Aulgur, Smyrna, Del. (Saskia A. Jordan of Haddon, Morgan & Foreman, P.C., Denver, Colo., of counsel), for defendant-petitioner.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

Petitioner Michael C. Hovey brings this action challenging his conviction pursuant to 28 U.S.C. § 2255 (1982). On February 5, 1986, Mr. Hovey pled guilty to two counts of an indictment charging him with the manufacture and distribution of 3–methylfentanyl in October and November 1985 in violation of 21 U.S.C. § 841(b)(1)(C) (Supp. 1987). During that period, 3–methylfentanyl ostensibly was a controlled substance under the temporary scheduling authority conferred by Congress on the Attorney General through 21 U.S.C. § 811(h) (Supp. 1987). Mr. Hovey was sentenced to two consecutive nine-year terms of imprisonment. Although he was represented by counsel, he was not advised of the possible defects in the scheduling of 3–methylfentanyl.[1] These alleged jurisdictional defects form the basis of his motion requesting the Court to vacate his conviction and sentence.

Michael Hovey urges several grounds supporting the grant of his motion. Initially, he asserts that the Court lacked jurisdiction to render judgment and sentence him because the Drug Enforcement Administration ("DEA") lacked the authority to temporarily schedule drugs pursuant to section 811(h) due to the failure of the Attorney General to delegate expressly his authority to the DEA. Hovey also contends Congress' initial delegation of authority to temporarily schedule drugs to the Attorney General violates constitutional principles of separation of powers. Assuming without deciding the constitutionality of the delegation of temporary scheduling authority to the Attorney General, the Court's determination that the DEA did not have the power to temporarily schedule 3–methylfentanyl under section 811(h) makes reaching the other asserted grounds unnecessary.[2]

1. The Government does not contest that the alleged jurisdictional defects in petitioner's conviction and sentencing are properly before the Court despite petitioner's plea of guilty. *See United States v. Milestone,* 626 F.2d 264, 266 n. 2 (3d Cir.) (jurisdictional defects subject to collateral attack under 28 U.S.C. § 2255), *cert. denied,* 449 U.S. 920, 101 S.Ct. 319, 66 L.Ed.2d 148 (1980), *citing Thor v. United States,* 554 F.2d 759, 762 (5th Cir.1977). Subsequent to his sentencing, Mr. Hovey brought motions for modification or reduction of his sentence, all of which were denied.

2. In addition to his attacks on the delegation by Congress and the Attorney General's failure to delegate, Hovey argues that no rational basis exists for section 811(h)'s automatic categoriza-

## I. Background on the Scheduling Provisions

Examining the congressional delegation of scheduling authority both highlights the differences between permanent and temporary scheduling and sets the framework for the analysis of the propriety and necessity of subdelegation to the DEA. The configuration of the permanent scheduling provisions contrasted with the later amendment adding temporary scheduling authority reveals the wide gap between the two scheduling schemes and the resulting need for explicit subdelegation of temporary scheduling powers.

### A. The 1970 Act

### 1. Permanent Scheduling under the Controlled Substances Act

In 1970 Congress passed the Comprehensive Drug Abuse Prevention and Control Act (the "1970 Act"), Pub.L. No. 91–513, 84 Stat. 1236 (now incorporated into the Controlled Substances Act ("CSA")).[3] The CSA established five schedules of controlled substances, with prohibitions and penalties varying according to the schedule in which a particular substance was placed. 21 U.S.C. § 812(a) (1982).

Congress initially divided controlled substances by schedule, but, in section 811, authorized the Attorney General to make future decisions to schedule or reschedule substances. The Attorney General's scheduling authority is constrained by four subsections of sections 811 and 812: (1) subsection 811(a), applying Administrative Procedure Act[4] requirements to the scheduling determination; (2) subsection 811(b), providing for mandatory recommendations from the Secretary of Health and Human Services ("HHS"); (3) subsection 811(c), which lists eight factors to be considered by the Attorney General in deciding whether a drug should be scheduled; and (4) subsection 812(b), defining the boundaries of the five schedules.

Subsection 811(a) directs the Attorney General to make section 812 findings in conformity with the APA. Thus the Attorney General (or the DEA) must make rules on the record, and must afford interested parties the opportunity for a hearing.

Subsection (b) of section 811 instructs the Attorney General to obtain from the HHS Secretary, prior to initiating scheduling proceedings, a "scientific and medical evaluation" and a recommendation "as to whether such drug or other substance should be so controlled...." 21 U.S.C. § 811(b) (1982). The recommendation is binding "as to such scientific and medical matters, and if the Secretary recommends that a drug or other substance not be controlled, the Attorney General shall not control the drug or other substance." 21 U.S.C. § 812(b); *see United States v. Gordon*, 580 F.2d 827, 838 (5th Cir.1978), *cert. denied sub. nom., Garcia v. United States*, 439 U.S. 1079, 99 S.Ct. 860, 59 L.Ed.2d 49 (1979).

In subsection 811(c), Congress established a list of factors for the Attorney General to consider in determining whether a drug should be scheduled:

(1) Its actual or relative potential for abuse.

(2) Scientific evidence of its pharmacological effect, if known.

(3) The state of current scientific knowledge regarding the drug or other substance.

(4) Its history and current pattern of abuse.

(5) The scope, duration, and significance of abuse.

(6) What, if any, risk there is to the public health.

---

tion of substances in schedule I of 21 U.S.C. § 812 (1982) and that the appropriate penalties for violation of section 841 in the case of temporarily scheduled substances are the penalties corresponding to violations involving schedule III substances. Lastly, Hovey contends the DEA did not comply with the publication requirements of section 811(h).

**3.** The CSA incorporated the 1970 Act and is composed of various laws enacted by the 91st, 93d, 95th, and 96th Congresses. The CSA is now codified as amended at 21 U.S.C. §§ 801–904 (1982).

**4.** 5 U.S.C. §§ 551–559 (1982) (the "APA").

(7) Its psychic or physiological dependence liability.

(8) Whether the substance is an immediate precursor of a substance already controlled under this subchapter.

21 U.S.C. § 811(c) (1982).

Subsection (b) of section 812, which delineates the requirements for categorization of substances in the different schedules, limits the rulemaking power of the Attorney General. For example, before a drug may be placed in Schedule I, three findings must be made: (A) that "[t]he drug or other substance has a high potential for abuse"; (B) that "[t]he drug or other substance has no currently accepted medical use in treatment in the United States"; and (C) that "[t]here is a lack of accepted safety for use of the drug or other substance under medical supervision." 21 U.S.C. § 812(b)(1) (1982).

## 2. The Constitutionality of the Delegation of Permanent Scheduling Power

The Supreme Court consistently describes the delegation of legislative power from Congress to the executive branch as constitutionally permissible if the delegated power is sufficiently definite "so that it may be known whether [the administrator receiving the power] has kept within it in compliance with the legislative will." *Yakus v. United States*, 321 U.S. 414, 425, 64 S.Ct. 660, 668, 88 L.Ed. 834 (1944); *see Zemel v. Rusk*, 381 U.S. 1, 17–18, 85 S.Ct. 1271, 1281–1282, 14 L.Ed.2d 179 (1965).

■ Courts addressing the validity of the delegation of legislative power to the Attorney General in sections 811 and 812 uniformly found the delegation constitutional.[5] The courts addressing the issue generally relied on (1) the clear statement of congressional policy [6]; (2) the specificity of the standards guiding the decisionmaker [7]; (3) the need for delegation in order to meet the congressionally identified problem [8]; and (4) the availability of judicial review to prevent arbitrary decisions.[9] Requiring a clear statement of congressional policy and specific standards, coupled with the availability of judicial review, allows courts to check the compliance of the delegatee with the legislative will. Permitting delegation of legislative authority subject to the above restrictions in circumstances where Congress cannot act effectively to address the problem also furthers legislative will. Thus, judicial analysis of the validity of delegations from Congress to the executive branch turns on the ability of courts to monitor compliance with congressionally determined policy.

---

5. *See, e.g., U.S. v. Alexander*, 673 F.2d 287 (9th Cir.), *cert. denied*, 459 U.S. 876, 103 S.Ct. 168, 74 L.Ed.2d 139 (1982); *U.S. v. Barron*, 594 F.2d 1345 (10th Cir.), *cert. denied*, 441 U.S. 951, 99 S.Ct. 2180, 60 L.Ed.2d 1056 (1979); *U.S. v. Gordon*, 580 F.2d 827 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *U.S. v. Roya*, 574 F.2d 386 (7th Cir.) *cert. denied*, 439 U.S. 857, 99 S.Ct. 172, 58 L.Ed.2d 165 (1978); *U.S. v. Pastor*, 557 F.2d 930 (2d Cir. 1977); *U.S. v. Davis*, 564 F.2d 840 (9th Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978); *U.S. v. Piatti*, 416 F.Supp. 1202 (E.D.N.Y.1976).

6. *U.S. v. Pastor*, 557 F.2d 930, 941 (2d Cir.1977).

7. *U.S. v. Gordon*, 580 F.2d 827, 838 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *U.S. v. Pastor*, 557 F.2d 930, 941 (2d Cir.1977); *U.S. v. Davis*, 564 F.2d 840, 844 (9th Cir.1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 733, 54 L.Ed.2d 760 (1978). As the *Gordon* court explained, the proper inquiry, "when considering an attack on congressional delegation, [is to] not only examine the entire Act to determine what standards, if any, have been provided but also whether such standards are sufficiently definite in light of the complexity of the area at which the legislation is directed and the susceptibility to change of the area in question,...." 580 F.2d at 839 (citations omitted).

8. *Gordon*, 580 F.2d at 839–40; *Pastor*, 557 F.2d at 941.

9. *Gordon*, 580 F.2d at 840 (the availability of judicial review, in combination with the defined standards and the need for delegation to regulate the area, provided "sufficient safeguards against the arbitrary control of drugs"); *Pastor*, 557 F.2d at 941. The *Pastor* court reasoned that not only was there need for expert action in the drug scheduling area, but also "[t]he procedures prescribed by Congress for regulation of the Attorney General's decision, coupled with the availability of judicial review ... assure that the delegatee will not act capriciously or arbitrarily." *Id.*

The standards guiding the decision to schedule under section 811(a), as described above, are detailed. One consequence of the detailed nature of the standards is that the length of time necessary to schedule a drug permanently is often at least a year.[10] Where the existence of the drug to be scheduled is known to the DEA prior to the rise of threatening levels of clandestine manufacture and street use, permanent scheduling mechanisms adequately protect the public. Where, however, as is the case with chemical analogs of already controlled substances ("designer drugs"), clandestine manufacture and distribution of substances begins to reach dangerous levels quickly, no mechanism existed prior to 1984 to temporarily bypass the permanent scheduling procedures and control the substances quickly.[11] As congressional attention focused on the designer drug phenomenon, the delays associated with permanent scheduling prompted Congress to attempt to develop a temporary scheduling mechanism.

### B. The 1984 Amendment to the CSA

In response to the designer drug phenomenon, Congress added a new subsection (h) to section 811 of the CSA (the "1984 amendment").[12] The new subsection allows the Attorney General to temporarily schedule substances on an emergency basis, where he determines that temporary scheduling "is necessary to avoid an immi-

nent hazard to the public safety...." 21 U.S.C.A. § 811(h) (Supp.1987). Three of the factors listed in section 811(c) guide the Attorney General in the temporary scheduling decision under section 811(h): the "history and current pattern of abuse" of the substance; "[t]he scope, duration, and significance of abuse"; and the risk, if any, "to the public health." 21 U.S.C.A. § 811(c)(4)–(6), (h) (Supp.1987). In addition to the three factors, subsection (4) of 811(h) requires the Attorney General to consider any HHS comments submitted in response to notice sent by the Attorney General to the Secretary informing her of the proposed emergency scheduling. 21 U.S.C.A. § 811(h)(4) (Supp.1987). Unlike the permanent scheduling scheme, however, the submission of comments is not mandatory.

The First Circuit Court of Appeals, in *Grinspoon v. Drug Enforcement Administration*, 828 F.2d 881 (1st Cir.1987), analyzed Congress' reasons for amending section 811 to add emergency scheduling provisions as follows:

"Congress has responded to the need for expedited investigation and prosecution of 'clandestine chemists who develop subtle chemical variations of controlled substances (called analogues or 'designer drugs') for illicit distribution and use,' H.R.Rep. No. 848, 99th Cong., 2d Sess., pt. 1, [at] 2 (1986), and permitted Schedule I controls to take effect without first

---

**10.** *See* Sen.Rep. No. 225, 98th Cong., 2d Sess., 263–65, *reprinted in* 1984 U.S.Code Cong. & Admin. News 3182, 3445–47.

**11.** Although the published legislative history of the 1984 amendment does not contain a discussion of the designer drug problem, the Senate report on a bill introduced the following year, S. 1437, the proposed "Controlled Substance Analogs Enforcement Act of 1986," describes the problem as follows:

A new epidemic of drugs varying in but slight degree from the most dangerous compounds currently proscribed by the Controlled Substances Act has demonstrated that the Act as presently structured is not alone sufficient to regulate the flow of illicit drugs. S. 1437 ... is necessary to close the loopholes that enable underground chemists to evade our Nation's drug laws.

Confined by Federal drug legislation that ties unlawful conduct to precise chemical def-

initions, law enforcement authorities have long found themselves at least one step behind drug dealers who possess certain rudimentary scientific abilities. Thus in the 1960's, certain mescaline derivatives created great problems until controlled under the ... Controlled Substances Act (CSA). In the 1970's, various analogs of PCP and methaqualone flourished until eventually brought within the exact definitions of the Act. Again in the 1980's the drug laws have been circumvented by profiteers capable of making minor alterations in the molecular structure of a controlled substance. Recent analogs have been based largely on the substances meperidine and fentanyl, from which models an almost infinite number of imitations can be derived. S.Rep. No. 196, 99th Cong., 1st Sess., 1–2 (Nov. 21, 1985).

**12.** Dangerous Drug Diversion and Control Act of 1984, Pub.L. No. 98–473, § 508, 98 Stat. 2071.

requiring a hearing so long as FDA approval [of use of the drug] is lacking. *Id.* at 891.

■ The portion of the Senate Report describing the temporary scheduling provision noted:

[Section 811 is amended] by adding a new subsection (h) that would permit the temporary emergency scheduling of a substance which presents an immediate danger to public safety. Under current 21 U.S.C. 811, before a substance may be designated for control under the Controlled Substances Act by the Attorney General, the Secretary of Health and Human Services (HHS) must first submit a scientific and medical evaluation of the substance, and the prior notice and hearing requirements of the Administrative Procedure Act ... must be met.... Historically, even when given a high priority, such as in the case of the rescheduling of PCP and the scheduling of its analogs, a scheduling action under current law takes at least six months, and often as long as a year. During the interim between identification of a drug that presents a major abuse problem and the eventual scheduling of the substance, enforcement actions against traffickers are severely limited and a serious health problem may arise.

S.Rep. No. 225, 98th Cong., 2d Sess., 263–64, reprinted in 1984 U.S.Code Cong. & Admin.News 3445–46 ("S.Rep."). In addition, subsection (6) of section 811(h) strongly evidences congressional intent to avoid the delays of permanent scheduling in light of the designer drug crisis. Subsection (h)(6) provides that orders issued under the emergency scheduling power are "not subject to judicial review." 21 U.S.C. § 811(h)(6).[13]

Once the Attorney General has determined that a substance, because of abuse potential or danger to the public, ought to be controlled, section 811(h) permits the temporary scheduling of a substance by the issuance of an order thirty days after publication of a notice proposing the temporary scheduling. The temporary scheduling ordinarily remains in effect for a year, but may be extended by six months. 21 U.S.C.A. § 811(h)(2) (Supp.1987).

## C. Hovey's Conviction

Several months after the enactment of subsection 811(h), the DEA initiated temporary proceedings to schedule 3–methylfentanyl, a close structural analog of fentanyl, a schedule II narcotic. Fentanyl produces morphine-like effects; 3–methylfentanyl not only manifests all of the narcotic properties of fentanyl, but also is far more potent than both fentanyl and morphine. See Exhibit "E" of Respondent's Br. (Evaluation of the Request for Scheduling Three–Methylfentanyl into Schedule I of the CSA).

On March 25, 1985, the DEA published a notice of the proposed scheduling of 3–methylfentanyl. 50 Fed.Reg. 11,690–92 (Mar. 25, 1985). Subsequently, the DEA extended the one-year period of 3–methylfentanyl temporary scheduling pursuant to 21 U.S. C. § 811(h)(2) (Supp.1987). 51 Fed.Reg. 15,474–75 (April 24, 1986). Thereafter, when the six month extension period expired on September 22, 1986, 3–methylfentanyl was permanently categorized as a schedule I substance. 51 Fed.Reg. 33,592–93 (Sept. 22, 1986).

On February 5, 1986, Mr. Hovey pled guilty to manufacturing and distributing 3–methylfentanyl in October and November of 1985, as charged by Counts I and III of the indictment.

## D. Summary

In summary, the permanent statutory scheme Congress constructed to meet the problem of addictive or otherwise dangerous substances consists of providing the

---

**13.** Given the fifth and sixth amendment difficulties which would result from cutting off judicial review of convictions, the Court treats subsection 811(h)(6) as eliminating judicial review of the decision to temporarily schedule, but not removing from review the convictions of those charged with section 841 violations based on temporarily scheduled substances. Accordingly, the authority of the DEA to temporarily schedule is reviewable as pertinent to the validity of petitioner's conviction.

Attorney General with the power to determine which substances warrant what degree of control, subject to detailed limits and procedural requirements. More than a decade after establishing permanent control procedures, motivated by "law enforcement considerations and the need to protect the public," S.Rep. at 265, 1984 U.S.Code Cong. & Admin.News at 3447, Congress gave the Attorney General a broad emergency power in order to allow immediate control of substances deemed particularly dangerous.

The core of petitioner's attack on the scheduling scheme is his contention that the Attorney General's power to temporarily schedule, even if valid, was never transferred to the DEA, and that therefore the DEA lacked the authority to temporarily schedule 3-methylfentanyl, or any drug. The government responds that the Attorney General's 1973 delegation of authority under the CSA should be read to encompass all subsequent amendments to the CSA, including amendments not yet passed.[14]

## II. Subdelegation

Before considering whether a valid subdelegation to the DEA occurred, the Court will address the threshold question of whether subdelegation to the DEA is proper. I conclude that it is.

### A. Subdelegation is Proper

■ Subdelegation of power by the Attorney General is specifically authorized by section 510 of title 28, which confers power on the Attorney General to delegate functions vested in him by Congress. 28 U.S.C. § 510 (1982); *see United States v. Nocar,* 497 F.2d 719, 723 (7th Cir.), *cert. denied,* 419 U.S. 1038, 95 S.Ct. 526, 42 L.Ed.2d 315 (1974).

In addressing the subdelegation issue, the *Nocar* court commented:

[W]e ... note that in 28 U.S.C. § 510, Congress provided that the Attorney General may make such provisions as he considers appropriate to allow other officers, employees or agencies to perform any of his functions. 28 C.F.R. 0.100 subdelegates the functions of the Attorney General under the Comprehensive Drug Abuse Prevention and Control Act to the Director of the Bureau of Narcotics and Dangerous Drugs.

*Nocar,* 497 F.2d, at 723.

Under section 510, the Attorney General is empowered to delegate his authority to "any other officer, employee, or agency of the Department of Justice...." *Id.* The decision to delegate, which the Attorney General "may from time to time make" through "such provisions as he considers appropriate," *id.,* is to an extent left up to the Attorney General's discretion. The Supreme Court, however, has recognized limits on the Attorney General's section 510 powers in circumstances where congressional intent so requires.

Congress, in conferring power on the Attorney General, rarely exhibits the intent to limit that power to that individual alone. *See United States v. Giordano,* 416 U.S. 505, 513–14, 94 S.Ct. 1820, 1825–26, 40 L.Ed.2d 341 (1974). In order to facilitate the administration of the various executive departments, Congress customarily vests delegated authority in the head of the department receiving the new power or function. *See* 1 K. Davis, *Administrative Law Treatise* §§ 3.17–.18 (2d ed. 1978). By so authorizing the individual head of an agency, Congress permits that officer to determine the best method of implementing the legislation. In this instance, while the legislative history is not express, there are none of the indications present in other cases in which the Court has held that Congress intended to limit the Attorney General's ability to redelegate legislatively conferred powers. Congress has not specified to whom the decision to temporarily schedule may be delegated, nor does the legislative history indicate that subdelegation should be limited.[15]

14. The DEA is part of the Department of Justice.

15. See *Giordano,* 416 U.S. at 514, 94 S.Ct. at 1826 (holding that language specifying to whom

the decision to apply for wiretap authority could be delegated, taken together with clear

The validity of subdelegating power from an agency head to subordinate officials or departments is well recognized. *United States v. Gordon*, 580 F.2d 827, 840 (5th Cir.), *cert. denied*, 439 U.S. 1051, 99 S.Ct. 731, 58 L.Ed.2d 711 (1978); *Van Blaricom v. Forscht*, 511 F.2d 615, 617 (5th Cir.), *cert. denied*, 423 U.S. 915, 96 S.Ct. 222, 46 L.Ed.2d 144 (1975); *United States v. Benish*, 389 F.Supp. 557, 558–59 (W.D.Pa.), *aff'd without op.*, 523 F.2d 1051 (3d Cir. 1975), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976). In addressing the subdelegation of permanent scheduling powers, the *Gordon* court noted that "the DEA must act pursuant to the same standards [as the Attorney General] in determining whether to schedule a drug." *Gordon*, 580 F.2d at 840 n. 6. Because the standards guiding the Attorney General were adequate, the court reasoned, those same standards adequately guided the DEA. *Id.* at 840 & n. 6.

In the case of temporary scheduling, however, the standards provided to guide the temporary scheduling decision confer wide discretion on the decisionmaker, and thus differ considerably from those constraining permanent scheduling. Consequently, assessing the propriety of subdelegation is more difficult. However, the lack of legislative history suggesting that subdelegation of temporary scheduling authority should be limited, coupled with the failure of the statutory language to explicitly limit the persons eligible to exercise the authority, leads to the conclusion that there is no basis for restricting the Attorney General's power to subdelegate.

A prominent example of the converse situation, in which Congress did intend to limit the discretion of the Attorney General to delegate his powers, is 18 U.S.C. § 2516(1) (1982), as interpreted by the Supreme Court in *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). Section 2516(1) provides that "[t]he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize an appli-

cation to a Federal judge [for] an order authorizing or approving the interception of wire or oral communications...." 18 U.S.C. § 2516(1) (1982). The initial application for an order to wiretap Giordano's phone, although purportedly authorized by a specially designated Assistant Attorney General, in fact was authorized by the Attorney General's executive assistant. *Giordano*, 416 U.S. at 509–10, 94 S.Ct. at 1823–24. A second application was similarly misrepresented. *Id.*

The Court held that, section 510 notwithstanding, Congress intended that the power to authorize wiretaps be limited to the persons specifically named in the statute, i.e., the Attorney General himself or his specially designated Assistant Attorney General. *Id.* at 508, 94 S.Ct. at 1823. The government argued that section 510 allowed the Attorney General to pass on his authority under the wiretap statute to his subordinates. *Id.* at 512, 94 S.Ct. at 1825. To this argument the Court responded:

> As a general proposition, the argument is unexceptionable. But here the matter of delegation is expressly addressed by § 2516, and the power of the Attorney General in this respect is specifically limited to delegating his authority to 'any Assistant Attorney General specially designated by the Attorney General.' Despite § 510, Congress does not always contemplate that the duties assigned to the Attorney General may be freely delegated.

*Id.* at 514, 94 S.Ct. at 1826.

*Giordano* presents a distinct situation in which Congressional intent to limit the officials authorized to apply for wiretaps was plain.[16] The legislative history of § 811(h), on the other hand, presents a less clear picture. What is plain is that Congress intended to remedy the designer drug problem by allowing the Attorney General to temporarily bypass the procedural protections of permanent scheduling. The Attorney General enjoys fewer restrictions as a result of section 811(h); the wiretap stat-

---

legislative history, showed congressional intent to limit subdelegation).

**16.** *See Giordano*, 416 U.S. at 516–17, 94 S.Ct. at 1827–28.

ute, in contrast, imposed greater restrictions on the Attorney General. Therefore, I conclude that subdelegation of section 811(h) power to the DEA is statutorily permissible.

### B. The 1973 Subdelegation of Permanent Scheduling Authority

■ In 1973 the Attorney General delegated his authority under the 1970 Act to the Bureau of Narcotics and Dangerous Drugs (now the DEA). 28 C.F.R. § 0.100(b) (1986).[17] That delegation reads:

The following-described matters are assigned to, and shall be conducted, handled, or supervised by, the Administrator of the Drug Enforcement Administration:

. . . .

(b) Functions vested in the Attorney General by the Comprehensive Drug Abuse Prevention and Control Act of 1970.

28 C.F.R. § 0.100 (1986).

The Attorney General did not expressly delegate his section 811(h) temporary scheduling authority to the DEA prior to Hovey's conviction.[18]

### C. Explicit Subdelegation is Necessary

Given the statutory ability of the Attorney General to subdelegate his powers under section 811(h) to the DEA, the question becomes whether he must affirmatively exercise his power to subdelegate, and, if so, whether he had in fact subdelegated his powers at the time Hovey committed the acts for which he was convicted. The government argues that the initial 1973 delegation of functions encompasses later amendments to the Act, making further delegation unnecessary. The petitioner argues that the Attorney General could not delegate in 1973 functions he did not receive until 1984, making further delegation essential.

Even accepting the Attorney General's assertion that powers not yet in existence may be delegated, no such expansive delegation occurred here prior to Mr. Hovey's conviction. The 1973 delegation does not purport to delegate any powers other than those created by the 1970 Act. Construing the 1973 delegation as effectively transferring only then-existing powers does not, as the Government contends, force the Attorney General to affirmatively act "each and every time there has been an amendment" to the CSA.[19] Rather, the Attorney General need only affirmatively delegate powers that differ significantly from previously delegated powers. Section 811(h) is more than a mere amendment to the CSA. It is a substantially broader power than the permanent scheduling authority, with far fewer procedural limits. Orders issued pursuant to it are not subject to judicial review. To assert that the emergency scheduling authority does anything less than dramatically extend existing powers is unpersuasive.

The only Court of Appeals to address the question of whether affirmative delegation is necessary in the present context, the Tenth Circuit, recently determined that explicit subdelegation is necessary. *United States v. Spain*, 825 F.2d 1426 (10th Cir. 1987); *United States v. Pees*, 645 F.Supp. 697 (D.Col.1986), *aff'd sub nom.*, *United States v. McNeill*, Nos. 86-2620 & 86-2621 (10th Cir. Oct. 19, 1987) (per curiam).[20] In

---

**17.** It is unclear whether a formal delegation of power to the Bureau of Narcotics and Dangerous Drugs occurred prior to 1973. The Director of the Bureau nevertheless issued an order scheduling phenmetrazine and other substances as early as 1971. *See U.S. v. Roya*, 574 F.2d at 392–93.

**18.** On June 18, 1987, while insisting that the 1973 delegation operated to delegate "all functions vested in him by the [1970 Act]," including any functions granted pursuant to amendments to the 1970 Act, the Attorney General ruled that "any functions vested in the Attorney General

by statutory amendments to the [CSA] are delegated to the Administrator of the Drug Enforcement Administration...." 52 Fed.Reg. 24,447 (July 1, 1987).

**19.** Respondent's Brief in Opposition to Petitioner's Motion, at 15.

**20.** Other district court decisions facing the question include *U.S. v. Wollman*, No. CR 86-199(A)-DT (C.D.Cal. July 24, 1986) (order holding emergency scheduling provisions properly subdelegated to the DEA Administrator); *U.S. v. Lichtman*, 636 F.Supp. 438, 440 (S.D.Fla.1986)

*Spain,* the panel reversed the district court's holding that methylenedioxymeth-amphetamine ("MDMA")[21] was properly scheduled under section 811(h). *Spain,* 825 F.2d at 1429.

The *Spain* court, in ruling that the DEA had no authority to temporarily schedule MDMA, relied primarily on the novelty of the section 811(h) power.

The subject as to which the discretion is exercised (public safety) and the breadth of the discretion given by Congress and the summary internal proceedings are factors to be considered in examining subdelegation to the DEA. Again, it must be observed that we are concerned with new executive branch proceedings to create the definition of a felony which are summary and internal in nature.

. . . .

To be sure, as the Government argues, § 811(h) was an amendment to the earlier Act. It was technically an "amendment," as described, but it was a different and separate addition to the Act with a new purpose and "procedure." The differences between the older Act, 811(a), and the new Act are so fundamental that it cannot be assumed that the 1973 subdelegation was intended or could be construed to cover the 1984 Act. After all we are concerned with an act made a crime by the executive branch under delegated authority.

*Id.* After emphasizing the novelty of the power and the caution with which delegations of legislative power to define crimes must be viewed, the court reiterated the principle that criminal statutes must be narrowly read. *Id., citing United States v. Bass,* 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971).[22] In the present instance, as in *Bass* and *Spain,* this principle has force.

Moreover, comparing the temporary scheduling provision with the permanent one leads just as surely to the conclusion that the DEA had no authority to temporarily schedule any substance without explicit authorization from the Attorney General. Section 811(a), now administered by the DEA through the 1973 delegation from the Attorney General, contains extensive procedural protections, requires binding comment from the Secretary of HHS, and mandates consideration of eight specific factors by the body initiating scheduling proceedings. 21 U.S.C. § 811(a)–(c) (1982). Most of the procedural requirements of section 811(a) are absent in section 811(h): the Administrative Procedure Act does not apply (§ 811(h)(1)); the HHS Secretary is not required to comment (§ 811(h)(1)); and only three factors must be considered when issuing an order temporarily scheduling a substance (§ 811(h)(3)).

Section 811(h)'s relative lack of procedural requirements reduces drastically the length of time necessary to schedule a drug, precisely in keeping with Congress' intent. However, I doubt that Congress intended to allow the DEA to automatically assume responsibility for administering the temporary scheduling provision without any formal action by the Attorney General. As Supreme Court dicta indicate, permitting such a casual delegation may make sense in situations where individual liberties are not implicated. *See, e.g., Greene v. McElroy,* 360 U.S. 474, 506–07, 79 S.Ct. 1400, 1418–19, 3 L.Ed.2d 1377 (1959). But where defendants found guilty of serious felonies under the CSA are sentenced to lengthy terms of incarceration, casual delegation, or delegation by acquiescence, is unacceptable. To hold otherwise would trivialize the importance of the rights at stake. The Supreme Court's decision in *Greene*[23] emphasizes the importance of

---

(relying in part on the subsequently overruled district court decision in *Spain* ).

**21.** MDMA is also known as "Ecstasy."

**22.** *Bass* affirmed the resolution of an ambiguity in a statute in favor of a defendant. 404 U.S. at 347, 92 S.Ct. at 522. However, the general principle of lenity relied upon in *Bass* extends be-

yond resolving ambiguities. *See Rewis v. U.S.,* 401 U.S. 808, 812, 91 S.Ct. 1056, 1059, 28 L.Ed. 2d 493 (1971).

**23.** Greene was an aeronautical engineer working for a defense contractor subject to Secretary of Defense regulations. *Greene,* 360 U.S. at 476, 79 S.Ct. at 1403. One such regulation required contractors in a particular category to discharge

protecting individual rights in areas of questionable constitutionality through careful delegation of authority.

Aspects of the temporary scheduling power are troubling, particularly its permanent impact on defendants whose actions are criminalized by the temporary scheduling of a substance in Schedule I, which carries substantially higher penalties than Schedules III, IV and V. Under temporary scheduling an offender may be sentenced to twenty years (and in some circumstances life imprisonment) for possession with intent to distribute a temporarily scheduled drug.[24] Later, after the full procedural protections of permanent scheduling have been employed, the drug may be classified as a Schedule III or IV substance. *See, e.g., Grinspoon v. Drug Enforcement Administration*, 828 F.2d 881, 891–92 (1st Cir.1987) (holding that statutory requirements for permanent scheduling of 3, 4–MDMA in schedule I were not met). Temporarily scheduled drugs must be placed in Schedule I. 21 U.S.C.A. § 811(h)(1) (Supp. 1987). The maximum incarceration for possession with intent to distribute a Schedule IV drug is three years. 21 U.S.C. § 841(b)(2) (1982). These troubling aspects of temporary control further support a strict requirement of explicit subdelegation, just as the effects of the policy at issue in *Greene* on individual employment rights led the Supreme Court to require explicit subdelegation in that instance.

While the present case differs from *Greene*, the contrast between the importance of protecting employment opportunities and the importance of protecting criminal defendants is heavily canted in Hovey's favor. Greene was deprived of his job; Hovey was deprived of his liberty. In the temporary scheduling context, I believe delegation should not be implied.

## III. Conclusion

By conferring power on the Attorney General to define a felony with no required input from any other agency, no hearing, no other administrative protections, no standards other than the three determinations left substantially to the discretion of the Attorney General, and by removing temporary scheduling orders from judicial review, Congress has created a drastic remedy for a drastic problem. The power is new and broad; the Court must assume that Congress did not intend the power to be exercised with anything but caution. Delegation by acquiescence underrepresents the extent of the temporary scheduling authority and its importance to the liberty of the accused. Interpreting the 1973 subdelegation to the DEA as encompassing after-acquired powers violates the same principles.

For the reasons explained above, the Court grants the petitioner's motion to vacate conviction and sentence pursuant to 28

---

employees without proper security clearances. *Id.* at 476–77 & nn. 2–3, 79 S.Ct. at 1493–04 & nn. 2–3. Greene's security clearance was revoked in an administrative hearing that allowed him no right of cross-examination or confrontation. *Id.* at 479, 79 S.Ct. at 1404.

The Court described the subdelegation issue as being "whether the President or Congress has delegated to the Department of Defense the authority to by-pass these traditional and well-recognized safeguards in an industrial security clearance program which can operate to injure individuals substantially by denying to them the opportunity to follow chosen private professions." *Id.* at 499–500, 79 S.Ct. at 1415. The Court rejected the Government's arguments that acquiescence or implied ratification would be sufficient to demonstrate proper delegation.

If acquiescence or implied ratification were enough to show delegation of authority to take actions within the area of questionable constitutionality, we might agree with respondents that delegation has been shown here. In many circumstances, where the Government's freedom to act is clear, and the Congress or the President has provided general standards of action and has acquiesced in administrative interpretation, delegation may be inferred.... But this case does not present that situation. We deal here with substantial restraints on employment opportunities of numerous persons imposed in a manner which is in conflict with our long-accepted notions of fair procedures.

*Id.* 360 U.S. at 506–07, 79 S.Ct. at 1418–19 (footnote omitted).

**24.** 21 U.S.C. § 841(b)(1)(C) (1982).

U.S.C. § 2255.  An order shall be presented on notice within twenty days.