UNITED STATES of America

v.

Daniel TOUBY and Lyrissa Touby, Defendants.

Crim. A. No. 89-6.

United States District Court, D. New Jersey.

March 17, 1989.

Samuel A. Alito, Jr., U.S. Atty. by Bona Horovits and Paul Brickfield, Asst. U.S. Attys., for the government.

Miller & Menaker by Steven Menaker, Jersey City, N.J., for defendant Daniel Touby.

Michael N. Pedicini, West Orange, N.J., for defendant Lyrissa Touby.

HAROLD A. ACKERMAN, District Judge.

On January 11, 1989, the Grand Jury in the United States District Court for the District of New Jersey in Newark returned

a two-count indictment against Mr. Daniel Touby and Mrs. Lyrissa Touby charging violations of (1) 21 U.S.C. § 846 for conspiracy to manufacture a mixture and substance allegedly containing 4–methylaminorex and (2) 21 U.S.C. § 841(a)(1) for manufacturing a mixture and substance allegedly containing 4–methylaminorex.

On March 10, 1989, I heard a battery of pretrial motions regarding certain discovery matters, most of which I disposed of in my March 14, 1989 order upon the parties' agreement and pursuant to certain constitutional doctrines and the Federal Rules of Criminal Procedure.

However, three matters remain outstanding: (1) the defendants' motion to exclude certain evidence pursuant to Federal Rules of Evidence, Rules 403 and 404(b); (2) the defendants' motion to dismiss the indictment; and (3) the defendants' motion to suppress certain evidence garnered in searches of the defendants' residence. As I indicated at the argument on March 10, 1989, Federal Rules of Evidence, Rule 404(b)/403 determinations are more properly evaluated during trial where probative value and purpose fully crystallize, rather than now, a more formative time in the litigation. Hence, I am left today to decide the defendants' motion to dismiss the indictment and to suppress evidence. Let me first turn to the motion to dismiss the indictment.

## MOTION TO DISMISS

The defendants challenge the constitutionality of the no-judicial review provision of 21 U.S.C. § 811(h)(6) and the constitutionality of Congress' delegation of power under 21 U.S.C. § 811(h) to the Attorney General to temporarily designate, as substances in the rubric of federal criminal drug abuse and control laws, substances such as 4–methylaminorex. The defendants also challenge the Attorney General's subdelegation of this power to temporarily schedule 4–methylaminorex to the Administrator of the Drug Enforcement Agency (DEA) as beyond the power that Congress permits for subdelegation of the Attorney General's authority to subor-

dinates. Therefore, the defendants assert that the DEA's temporary scheduling of 4–methylaminorex as a Schedule I substance subject to certain prohibitions and penalties under federal anti-drug laws is invalid. The defendants thus conclude that since their indictments are based on a temporary scheduling of a substance made contrary to law, I must dismiss the indictment against them. The government contests these arguments.

### A. Background

Some background is necessary regarding *permanent* and *temporary* scheduling of substances, before I can properly assess the defendants' request for dismissal of the indictment.

In 1970, Congress passed the Comprehensive Drug Abuse Prevention and Control Act, 84 Stat. 1236, which is now incorporated into the Controlled Substances Act ("CSA"), *codified, as amended,* at 21 U.S.C. §§ 801–904. In the CSA, Congress established that certain "controlled substances" would be placed in different "schedules" with penalties for violations of the law varying according to the scheduling of the substance. For instance, a Schedule I substance is one that has a high potential for abuse, has no accepted medical use in treatment in the United States, and has a lack of accepted safety for use of the substance under medical supervision. A Schedule V substance has a low potential for abuse relative to scheduled substances I through IV, has a currently accepted medical use in treatment in the United States and its abuse may lead to limited dependence relative to the drugs on Schedules I through IV. *See* 21 U.S.C. § 812(b)(1) & (5). The penalty for a violation involving a Schedule I substance is therefore greater than the penalty for a violation involving a Schedule V substance. *See* 21 U.S.C. § 841.

Congress scheduled a number of substances itself, but also authorized the Attorney General to permanently schedule substances, transfer between schedules, or

remove a substance from a schedule. *See* 21 U.S.C. § 811(a). Congress restrained the Attorney General's exercise of this delegated scheduling power by providing certain safeguards in the statute. For instance, the Attorney General must find that the substance has "potential for abuse" and consider the following with respect to each substance proposed to be controlled:

(1) its actual or relative potential for abuse;

(2) scientific evidence of its pharmacological effect, if known;

(3) the state of current scientific knowledge regarding the drug or other substance;

(4) its history and current pattern of abuse;

(5) the scope, duration, and significance of abuse;

(6) what, if any, risk there is to the public health;

(7) its physchic or physiological dependence liability; and

(8) whether the substance is an immediate precursor of a substance already controlled under this subchapter. *Id.* § 811(c).

Under § 811(b), the Attorney General must also obtain a "scientific and medical" evaluation of the substance from the Secretary of Health and Human Services. If the Secretary recommends that the Attorney General should not schedule the substance, then the Attorney General must adhere to that recommendation. *Id.* § 812(b). Moreover, the Attorney General's rulemaking as to the permanent scheduling decision of any particular substance must conform to the Administrative Procedure Act ("APA"), *codified at* 5 U.S.C. §§ 551–559, making the rule on a record and with notice and opportunity for a hearing to interested parties. *See* 21 U.S.C. § 811(a).

In 1973, pursuant to 21 U.S.C. § 871(a) ("The Attorney General may delegate any of his functions under this subchapter to any officer or employee of the Department of Justice."), the Attorney General subdelegated performance of his functions delegated to him by Congress under the CSA to the DEA administrator. *See* 28 C.F.R. § 0.100(b).

With the passage of time, it became obvious to Congress that the mechanism of permanent scheduling by the Attorney General, even when given a "high priority," was taking six months to a year. S.Rep. No. 225, 98th Cong., 2d Sess. 264, *reprinted in* 1984 U.S.Code Cong. & Admin.News 3182, 3446. Congress therefore reckoned that: "[d]uring the interim between identification of a drug that presents a major abuse problem and the eventual scheduling of the substance, enforcement actions against traffickers are severely limited and a serious health problem may arise." *Id.* at 264, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 3446.

Mindful of this problem, in 1984 Congress amended the CSA to permit the Attorney General to schedule substances, on a temporary basis, to "avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h)(1). Specifically, the relevant part of the amendment provided that:

(1) If the Attorney General finds that the scheduling of a substance in schedule I on a temporary basis is necessary to avoid an imminent hazard to the public safety, he may, by order and without regard to the requirements of subsection (b) of this section relating to the Secretary of Health and Human Services, schedule such substance in schedule I if the substance is not listed in any other schedule in section 812 of this title or if no exemption or approval is in effect for the substance under section 355 of this title. Such an order may not be issued before the expiration of thirty days from—

(A) The date of the publication by the Attorney General of a notice in the Federal Register of the intention to issue such order and the grounds upon which such order is to be issued, and

(B) the date the Attorney General has transmitted the notice required by paragraph (4).

(2) The scheduling of a substance under this subsection shall expire at the end of one year from the date of the issuance of the order scheduling such substance, except that the Attorney General may, during the pendency of proceedings under subsection (a)(1) of this section with respect to the substance, extend the temporary scheduling for up to six months.

(3) When issuing an order under paragraph (1), the Attorney General shall be required to consider, with respect to the finding of an imminent hazard to the public safety, only those factors set forth in paragraphs (4), (5), and (6) of subsection (c) of this section, including actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or distribution.

(4) The Attorney General shall transmit notice of an order proposed to be issued under paragraph (1) to the Secretary of Health and Human Services. In issuing an order under paragraph (1), the Attorney General shall take into consideration any comments submitted by the Secretary in response to a notice transmitted pursuant to this paragraph.

(5) An order issued under paragraph (1) with respect to a substance shall be vacated upon the conclusion of a subsequent rulemaking proceeding initiated under subsection (a) of this section with respect to such substance.

(6) An order issued under paragraph (1) is not subject to judicial review.

21 U.S.C. § 811 (h).

The Senate Report supporting the amendment differentiated the temporary scheduling provision from the permanent one as follows:

Under new subsection (h), the Attorney General would be permitted to control a substance on a temporary basis without meeting the prior notice and hearing requirements of 21 U.S.C. § 811(a) or the Department of Health and Human Services' evaluation requirement of 21 U.S.C. § 881(b) [811(b)], if such action was "necessary to avoid an imminent hazard to the public safety." In issuing a temporary ruling under this new provision, the Attorney

General would be required to consider only those factors set out in 21 U.S.C. § 811(c)(4), (5) and (6) which relate to the history, current pattern, scope, duration and significance of abuse of the substance, and the risk it poses to the public health. New subsection (h)(1) specifically focuses attention on actual abuse, diversion from legitimate channels, and clandestine importation, manufacture, or marketing.

S.Rep. No. 225, 98th Cong., 2d Sess. at 264, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3446.

Congress hoped that the temporary scheduling measure would allow the Attorney General to respond with more alacrity to the menace to the public from drug abuse. Congress recognized that illicit drug traffic was moving too fast to be handled by the permanent scheduling procedures.

The legislative history recognized that:

Law enforcement considerations and the need to protect the public may require action that cannot await the exhaustive medical and scientific determinations ordinarily required when a drug is being considered for control. The emergency control amendment of section 506 [21 U.S.C. section 811(h)] permits such action on a temporary basis until the more extensive scheduling procedures required under current law can be met. S.Rep. No. 225, 98th Cong., 2d Sess. at 265, *reprinted in* 1984 U.S.Code Cong. & Admin.News at 3447.

With this new emergency power in hand, the Attorney General executed the following regulation on July 1, 1987 providing that: "Functions vested in the Attorney General by the Comprehensive Drug Abuse Prevention and Control Act, as amended" were assigned to, to be conducted by, handled and supervised by the DEA administrator. 28 C.F.R. § 0.100(b). This "subdelegation" from the Attorney General to the DEA administrator specifically included "functions which may be vested in the Attorney General in subsequent amendments to the Comprehensive Drug Abuse Prevention and Control Act of 1970, and not otherwise specifically assigned or reserved by

him." *Id.*

On August 13, 1987, the DEA Administrator noticed his intent to temporarily schedule 4–methylaminorex as a Schedule I substance. 52 Fed.Reg. 30174 (August 13, 1987). In so doing, the DEA Administrator acknowledged his power to temporarily schedule substances which the Attorney General delegated to the Administrator under 28 C.F.R. § 0.100. *Id.* The administrator reasoned that it was necessary to schedule this substance because it was "an imminent hazard to the public safety." *Id.* The administrator explained that: "2–amino-4–methyl–5–phenyl–2–orazoline [4–methylaminorex] is a new substance that is clandestinely produced, that is distributed in the illicit [drug traffic], and that produces stimulant effects." *Id.* The substance was like an amphetamine, "a potent central nervous system stimulant." Depending on the dosage, it could increase blood pressure, cause increased alertness, or, in greater quantities end in seizures, loss of consciousness, respiratory depression, or death. *Id.* Reviewing its pharmacological studies, the DEA Administrator concluded the substance had "a low margin of safety." *Id.* Citing the three factors necessary to assess scheduling under 21 U.S.C. § 811(h), the DEA Administrator temporarily placed the substance in the Schedule I category. *Id.* at 30175. The DEA Administrator also noted that 4–methylaminorex was a substance with no currently approved medical use or manufacture in the United States. *Id.*

On October 15, 1987, the DEA Administrator issued an order temporarily scheduling 4–methylaminorex for a year. *See* 52 Fed.Reg. at 38225–26 (October 15, 1987). The DEA Administrator, with the Secretary's concurrence, issued a notice of a proposed rulemaking to permanently schedule the substance as a Schedule I substance upon expiration of this one-year period. Under separate notice, the DEA Administrator extended the temporary scheduling period for an additional six months, as permitted under the statute. *See* 53 Fed.Reg. 40061 (October 13, 1988).

As I related earlier, Mr. Touby and Mrs. Touby were indicted for the alleged manufacture and conspiracy to manufacture 4–methylaminorex. The Toubys challenge the validity of the temporary scheduling of this substance.

First, they assert that the statute provides no judicial review of the Attorney General's exercise of discretion and is therefore unconstitutional. Second, they state that Congress articulated no "intelligible principles" by which to guide the Attorney General in the exercise of his authority under Section 811(h), thereby violative of the constitutional doctrine of delegation. Rather, the directions are too vague and malleable. Third, the defendants contend that the Attorney General's subdelegation of power to the DEA administrator was not provided by statute. Fourth, the defendants observe that the Attorney General's action subjects individuals to enormous criminal sanctions. This fourth "argument" is merely a consideration in assessing the other three arguments. I do not find merit in any of the three substantive arguments advanced by the defendants.

### B. No–Judicial Review

21 U.S.C. § 811(h)(6) states that "[a]n order issued under [§ 811(h)(1) ] is not subject to judicial review." In *United States v. Emerson,* 846 F.2d 541, 544–46 (1988), the United States Court of Appeals for the Ninth Circuit held that absent "clear and convincing" evidence that Congress intended to preclude constitutional review of temporary scheduling orders, § 811(h)(6) did not preclude constitutional review of a temporary scheduling order by the judiciary. *Id.* at 544. Therefore, the defendants' argument that § 811(h) is invalid for lack of constitutional review is unavailing because constitutional review of orders exists.

As for judicial review of the Attorney General's compliance with the relevant statutory requirements, the Ninth Circuit did not decide what amount of statutory review was available. *See id.* (*citing United States v. Caudle,* 828 F.2d 1111, 1112

(5th Cir.1987) (the DEA's failure to issue a separate order scheduling a certain substance after the 30–day period after notice of intent was given invalidated the scheduling for failure to provide the exact statutory procedure—indicating that some statutory review is available)). In *Emerson,* the Ninth Circuit did hold, however, that there was no constitutionally imposed requirement of judicial review to ensure compliance with statutory standards. *Id.* at 545. The court explained that if judicial review for compliance with statutory standards was the requirement, then such requirement would directly contravene decisions denying statutory review of the executive's exercise of legislatively delegated powers. *Id.* (*citing, e.g., Block v. Community Nutrition Inst.,* 467 U.S. 340, 348, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984); *Heckler v. Chaney,* 470 U.S. 821, 838 (1985); *Rosen v. Walters,* 719 F.2d 1422, 1423 (9th Cir. 1983) (all decisions denying availability of judicial statutory review)).

Following the Ninth Circuit's reasoning, I find no impediment to the temporary scheduling procedure based on whatever constraint it places on statutory review of the Attorney General's order to temporarily schedule a substance. Since there is constitutional review of the scheduling and since there is no constitutional requirement for statutory review, the judicial-review argument cannot aid the defendants' case for dismissal of the indictment.

### C. Delegation

As to the defendants' second argument, regarding delegation—namely, that Congress has not provided the Attorney General with "intelligible principles" to which the Attorney General can conform his exercise of his delegated authority—the United States Supreme Court's recent decision in *Mistretta v. United States,* — U.S. —, 109 S.Ct. 647, 655, 102 L.Ed.2d 714 (1989), the "sentencing guidelines" case, provides guidance.

As the *Mistretta* court observed: "the nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of government." *Id.*

109 S.Ct. at 654. Only Congress legislates, *see* U.S. Const., Art. I, Section I, but in a nation that is far more complex than the one that the Framers encountered in 1789, Congress would not be able to carry out its duties were it to be constitutionally compelled to consider every situation arising from a particular policy. *See, e.g., American Power & Light Co. v. SEC,* 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). Hence, delegation of authority has become a necessity for the efficient administration of our government. However, there must be a control on Congress' ability to delegate, for there is a difference between delegation of legislative power and abdication of constitutional duty to make the law.

In *Mistretta,* the Court again recognized the main check on Congress' delegation of legislative power to a nonlegislative branch stating that so long as Congress "shall lay down by legislative act an *intelligible principle* to which the person or body authorized [to exercise the delegated authority] is directed to conform, such legislative action is not a forbidden delegation of legislative power." *Id.* at ——, 109 S.Ct. at 654 (emphasis added) (*quoting J.W. Hampton, Jr. & Co. v. United States,* 276 U.S. 394, 409, 48 S.Ct. 348, 352, 72 L.Ed. 624 (1928)).

Distilling *Mistretta,* the following factors satisfy the constitutional requisite of statutory "intelligible principles" necessary to guide the delegate:

Congress should:

(1) provide the delegate with goals and specify the objects that the delegate must keep in mind in pursuing the goals that Congress enunciates, 109 S.Ct. at 655;

(2) describe the final product of the delegation, *see id.* at 656;

(3) offer specific factors for the delegate to consider in achieving the final product, *see id.* at 656; and

(4) place limitations on the delegated power, *see id.* at 657.

*See also American Power & Light Co., supra,* 329 U.S. at 105, 67 S.Ct. at 142

(Congress passes the "intelligible-principle" test if it "clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." (*quoted in Mistretta, supra,* 109 S.Ct. at 647)). Between the language of § 811(h) itself and the spare, but revealing, legislative history of § 811(h), I find that Congress has articulated intelligible principles for the Attorney General to follow in exercising the delegated authority.

First, Congress has set forth its goal of avoiding imminent hazard to the public safety by its delegation of the power to the Attorney General to schedule temporarily certain substances. 21 U.S.C. § 811(h)(1). It further defined this goal when it stated in the legislative history that the bill enabled the Attorney General to respond quickly to rapid illicit traffic of new types of substances; to better enable the authorities to gain the upper hand in the war on drugs. *See* S.Rep. No. 225, 98th Cong., 2d Sess., at 264–65, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 3446–3447.

Second, Congress has described the final product of the delegation. It stated that the delegation should lead to certain substances, specified as dangerous, being included on the schedule of controlled substances. Their manufacture, distribution, or possession would be subject to sanction for a temporary time (one year plus six months) until the Attorney General effected permanent scheduling. *See* 21 U.S.C. § 811(h)(1) & S.Rep. No. 225, 98th Cong., 2d Sess., at 263–65, *reprinted in* 1984 U.S. Code Cong. & Admin.News at 3445–47.

Third, Congress has offered specific factors for the Attorney General to assess in determining the final product. The Attorney General must consider subsections 811(c)(4), (5) and (6), including "actual abuse, diversion from legitimate channels, clandestine importation, manufacture and distribution." 21 U.S.C. § 811(h)(3). While these factors are not as numerous as in the permanent scheduling procedure, they are specific and provide a guide for the delegate to follow.

Fourth, Congress provided specific restraints on the Attorney General's power as to duration of the order, 21 U.S.C. § 811(h)(2), timing of the order after notice of intent to issue the order, *id.* § 811(h)(1); and vacation of the order upon conclusion of a subsequent rulemaking proceeding, *id.* § 811(h)(5). Moreover, as indicated earlier, the order is subject to constitutional review.

In sum, 28 U.S.C. § 811(h) and its legislative history set forth more than the minimum of intelligible principles. Since Congress has outlined the policies giving rise to the delegation, explained what the Attorney General should do and what factors he should consider, and placed limits on this scheduling power, the delegation to the Attorney General is constitutional, adhering to separation of powers doctrine, by satisfying the "intelligible principles test." *See Mistretta,* 109 S.Ct. at 658 (*quoting United States v. Chambless,* 680 F.Supp. 793, 796 (E.D.La.1988)).

Two pre-*Mistretta* cases have treated the § 811(h) delegation issue, though in brief fashion. In *United States v. Emerson, supra,* the Ninth Circuit upheld the delegation, observing that sufficient guidelines and standards accompanied the authority delegated to the Attorney General. The Ninth Circuit observed that: "Section 811(h)'s scheduling criteria are as specific as reasonable practicable to meet the threat to the public safety posed by 'designer drugs,' and to provide the Attorney General with sufficient guidance in scheduling dangerous substances temporarily." 846 F.2d at 545. For the reasons articulated above, the *Emerson* Court's observance is persuasive and I follow it.

I note, in passing, that in *United States v. Spain,* 825 F.2d 1426 (10th Cir.1987), which the defendants cite to call the delegation into question, the Tenth Circuit stated that: "The Congressional delegation to the Attorney General is not without doubt as to the adequacy of standards in 811(h), but for these purposes we do not decide but assume it valid." *Id.* at 1429. Since *Spain* held that the DEA lacked authority to schedule temporarily a drug absent *express* subdelegation, the *Spain*

Court's observation regarding delegation is mere *dicta*. In view of the outcome of the *Mistretta* test and the Ninth Circuit's observance in *Emerson, supra,* I find that the delegation of temporary scheduling power to the Attorney General is not violative of the constitutional doctrine of separation of powers.

## D. Subdelegation

The defendants also challenge the subdelegation of temporary scheduling power from the Attorney General to the DEA Administrator. They argue that since the 1984 amendment to the statute containing § 811(h) did not specifically grant the Attorney General the power to subdelegate his delegated authority to the DEA Administrator, the temporary scheduling of 4-methylaminorex, and, consequently, the Touby indictments, must fall. They state that 21 U.S.C. § 871(a), providing that the Attorney General could "delegate any of his functions under the subchapter to any officer or employee of the Department of Justice," 84 Stat. 1270 (1970), cannot be applied to the 1984 amendment and subdelegation cannot be inferred.

The defendants' reading of the relevant statutes is misguided. Whatever the effect of 21 U.S.C. § 871(a), whether it applies to the 1984 amendment or not, it merely echoes the general mandate concerning the Attorney General's subdelegation of any of his functions which Congress legislated under 28 U.S.C. § 510, an act passed in 1966. 80 Stat. 378, 612 (1966). ("The Attorney General may from time to time, make such provisions as he considers appropriate authorizing the performance by another officer, employee, or agency of the Department of Justice of any function of the Attorney General."). *See United States v. Burnes,* 816 F.2d 1354, 1359 (9th Cir.1987). Hence, it is beyond doubt that the Attorney General possesses the statutory authority to subdelegate his delegated temporary scheduling power.

Another district court from this circuit has recognized the propriety of subdelegation in *United States v. Hovey,* 674 F.Supp. 161, 167 (D.Del.1987). There, Judge Schwartz found that 28 U.S.C. § 510 specifically authorized the Attorney General to subdelegate his § 811(h) power. *Id.* at 167. Although acknowledging the problems with subdelegation in that the temporary scheduling power provided the Attorney General with a wider range of discretion than the permanent scheduling power, the court reckoned that "the lack of legislative history suggesting that subdelegation of temporary scheduling authority should be limited, coupled with the failure of the statutory language to explicitly limit the persons eligible to exercise the authority," led to the conclusion that the Attorney General possessed the power to subdelegate his § 811(h) authority. *Id.* at 168. I agree with Judge Schwartz's observations.

*United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) dictates no different result. There, the United States Supreme Court was faced with a delegation provision that provided that "[t]he Attorney General, or any Assistant Attorney General specifically designated by the Attorney General, may authorize an application to a federal judge [for] an order authorizing or approving the interception of wire or oral communications...." 18 U.S.C. § 2516(1). A party other than the Attorney General or a specially designated assistant Attorney General authorized the application. *Id.* at 509–10, 94 S.Ct. at 1823–24. The Court invalidated that authorization, holding that Congress specifically limited the power to those officers designated in the statute. The Court described the interplay between 18 U.S.C. § 2516(1) and 28 U.S.C. § 510, stating:

"[T]he matter of delegation is expressly addressed by Section 2516, and the power of the Attorney General in this respect is specifically limited to delegating his authority to 'any Assistant Attorney General specifically designated by the Attorney General.' Despite Section 510, Congress does not always contemplate that the duties assigned to the Attorney General may be freely delegated. Under the Civil Rights Act of 1968, for instance, certain prosecutions are authorized only on the certification of the Attorney General or the Deputy

Attorney General, 'which function of certification may not be delegated.' 18 U.S.C. Section 245(a)(1). Equally precise language forbidding delegation was not employed in the legislation before us; but we think Section 2516(1), fairly read, was intended to limit the power to authorize wiretap applications to the Attorney General himself and to any Assistant Attorney General he might designate." *Giordano*, 416 U.S. at 514. Hence, *Giordano* teaches that Congress must expressly state a limitation on the Attorney General's statutory power to subdelegate, especially in view of Congress' grant of power to the Attorney General to subdelegate under 28 U.S.C. § 510. There being no express limitation in the instant action, the Attorney General has the power to subdelegate his § 811(h) power.

Of course, I note that the subdelegate must be under the same constraints that bind the delegate (which constraints the Administrator followed here, as indicated *supra*). Further, if the delegation does not comply with the "intelligible principles" test, then the subdelegation must fall as well. *See, e.g., Hovey*, 674 F.Supp. at 168.

As *Emerson*, 846 F.2d at 548; *accord United States v. McLaughlin*, 851 F.2d 283, 284 (9th Cir.1988); *Hovey*, 674 F.Supp. at 169; and *United States v. Pees*, 645 F.Supp. 697, 704 (D.Colo.1986) hold, the subdelegation from the Attorney General to the DEA Administrator must be explicit. The *Pees* court explained the reasons for express delegation:

"It is a well-settled point of law that subdelegation of authority from the Attorney General to an administrative agency is a valid authorization of power.... The logical and necessary implication of that rule of law is that there must be an *affirmative act* on the part of the Attorney General in which he subdelegates his authority. If the Attorney General were not required to execute an affirmative act in subdelegating his authority, the authority of other administrative agencies *vis. a vis.* the authority of the Attorney General would be hopelessly ambiguous and unworkable. Congress has never manifested an intent to allow administrative agencies to assume, by implication, the powers vested explicitly and exclusively in the Attorney General without the *official* subdelegation of such powers by the Attorney General in a manner subject to recordation and accountability."

*Id.* at 704 (citation omitted) (emphasis in original). It should also be noted in this regard that explicit subdelegation allows an opportunity for prior review, however lenient, of the propriety of subdelegation. *See Emerson*, 846 F.2d at 548.

Here, the Attorney General expressly subdelegated his power under § 811(h) to the DEA Administrator. *See* 28 C.F.R. § 0.100(b) (July 1, 1987). Thereafter, the Administrator scheduled, on a temporary basis, the substance, 4–methylaminorex. This scheduling was proper because unlike *Emerson* and *Hovey*, the Attorney General expressly delegated the power and *then* the DEA administrator temporarily scheduled 4–methylaminorex.

Further, as I have stated above, the "schedule-makers" (the Attorney General and the DEA Administrators) both received their power to implement the temporary scheduling in a lawful manner. Hence, I find the subdelegation to be entirely proper.

### E. Summary

Since defendants' challenge to Section 811(h) based on no-judicial review, improper delegation, and improper subdelegation is without merit, I deny defendants' motion to dismiss the indictment.

### THE SUPPRESSION MOTION

On January 5, 1989, the Wanaque police arrested the Toubys on a street in Wanaque, New Jersey, charging them with possession of a forged instrument, theft by deception, possession of marijuana, and possession of drug paraphernalia. In obtaining a search warrant for the Toubys' residence, Detective Sergeant Robert Jordan of the Wanaque Police Department swore out an affidavit upon which the magistrate based his issuance of the warrant.

The affidavit provided in pertinent part:

"On January 5, 1989, Lyrissa Touby and Daniel Touby were arrested in Wanaque, New Jersey, on charges of uttering a forged instrument, theft by deception and possession of marijuana and possession of drug paraphernalia. The arrest resulted from a purchase of a television by the two suspects with a counterfeit cashiers check drawn on the City Federal Bank, Paramus, New Jersey. Defendants were arrested following the purchase of the TV in a motor vehicle. A search, incidental to the arrest, revealed Daniel Touby was in possession of marijuana and drug paraphernalia. Also located in the motor vehicle was a substance Cycocel liquid.

"A check with the FBI lab in Washington, D.C., indicated that Cycocel is a brand name plant stimulator manufactured by American Cyanimid. In checking with City Federal, it was learned that City Federal does not issue cashiers checks. Further, the account number listed on the check recovered does not match any account number with City Federal.

"Following the arrest of the defendants, Daniel Touby stated they were both in the business of printing T-shirts for rock concerts under the name In Flight Transfers, Inc. It should also be noted, that when arrested, Daniel Touby had what appeared to be blue ink on his hands. The color of the blue ink was similar to the blue ink color which appeared on the counterfeit check indicating City Federal dollar sign, then the numbers 2000 and 00 cents.

"A criminal history check revealed that Daniel Touby had been arrested for drug violations (11), forgery and counterfeiting (2), burglary (2), larceny (2) and stolen property (1).

"Detective Wilcox of Morristown P.D. indicated that Daniel Touby has been convicted of the charge of counterfeiting and forgery and numerous drug offenses and is presently awaiting sentencing in Morris County Superior Court. One of the charges in Morristown involved a large number of marijuana plants, according to Detective Wilcox.

"A criminal history check as to Lyrissa Touby shows arrests for drug violations (10), forgery and counterfeiting (2). Detective Wilcox noted Lyrissa Touby was also convicted for drug offenses and forgery and counterfeiting and is awaiting sentencing in Morris County Superior Court.

"The investigation revealed that Lyrissa Touby and Daniel Touby reside at 14-08 River Road, Fair Lawn, New Jersey. The own additional address for the business were two post office boxes in Denville, New Jersey, which have both been closed. The business itself, to the best of the affiant's knowledge, is being operated out of the home. The affiant believes that the house of Lyrissa Touby and Daniel Touby may contain items used in the crime of counterfeiting and forgery, and various controlled dangerous substances.

"As a result of the investigation conducted, I have reason to believe and do believe that the aforementioned items will be located on the premises."

Officers searched the defendants' residence for dangerous substances and items and equipment used in forging documents on January 6, 1989. Specifically, the warrant indicated that law enforcement officers were looking for "printing equipment, such as plates/stamps used to prepare checks, from City Federal Savings and Loan Association in Paramus, New Jersey, blue printers ink and controlled dangerous substances such as marijuana, marijuana plants and paraphernalia for use of the substances." In the January 6, 1989 search, the police observed more items which were not subsumed under the original search warrant. They swore out another warrant to seize those items on January 7, 1989. The warrant indicated that those items were chemicals, glassware, cookers and other items used in a laboratory.

The defendants argue that I should suppress the evidence seized in the January 6th and January 7th searches because the original search warrant was defective, lacking probable cause. They argue that Detective Jordan's knowledge and information arising from the January 5th arrest "raised no more than a mere suspicion" that additional evidence existed and could be found at the Touby house. The defendants con-

tend that the detective's investigation and his affidavit revealed no facts permitting an inference that evidence of counterfeiting and/or drugs was present at the defendants' home. Defendants further assert that the evidence from the second search be suppressed as a "direct exploitation" of the initial, unlawful search conducted on January 6, 1989. The defendants also contend that the warrant is not within the good-faith exception to the warrant requirement because Detective Jordan's reliance on the warrant was not objectively reasonable.

I note, in passing, that the defendants, in argument on March 10, 1989, expressly stated that no evidentiary hearing was necessary and that they would rest on their papers.

For its part, the government argues that one could easily draw an inference from the facts of Detective Jordan's affidavit that the defendants' T-shirt business was conducted in the defendants' home, in view of the only additional addresses being post office boxes in Denville, New Jersey. Hence, the government asserts that it was a "short step" in logic to infer that the residence was being used for counterfeiting purposes. The government therefore argues that probable cause for the search existed and, consequently, that I should not suppress the evidence garnered from the two searches.

### A. Probable Cause

The Fourth Amendment to the United States Constitution states that:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, *but upon probable cause*, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (Emphasis added).

■ Probable cause is not susceptible of easy definition. It exists where the facts presented in the affidavit are such that a reasonable person would believe that the instrumentalities or evidence of the alleged crime will be found at the place to be searched. *United States v. Tehfe*, 722 F.2d 1114, 1117 (3d Cir.1983), *cert. denied*, 466 U.S. 904, 104 S.Ct. 1679, 80 L.Ed.2d 154 (1984) (*citing Zurcher v. Stanford Daily*, 436 U.S. 547, 553–60, 98 S.Ct. 1970, 1975–79, 56 L.Ed.2d 525 (1978)); *see also Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

In reviewing a judicial officer's determination of probable cause, the district judge must read and interpret the affidavit in a nontechnical, common sense, and realistic manner. *United States v. Ventresca*, 380 U.S. 102, 108 & 109, 85 S.Ct. 741, 745, & 746, 13 L.Ed.2d 684 (1965). A reviewing court should not undertake a *de novo* review of a judicial officer's determination; rather the court should pay great deference to the initial determination of probable cause by a neutral magistrate. *Illinois v. Gates*, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1982) (*quoting Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 590, 21 L.Ed.2d 637 (1969)). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for ... concluding' that probable cause existed." *Gates*, 462 U.S. at 238–39, 103 S.Ct. at 2332–33 (*quoting Jones v. United States*, 362 U.S. 257, 271 (1960)); *see United States v. Kepner*, 843 F.2d 755, 762 (3d Cir.1988); *United States v. Vastola*, 670 F.Supp. 1244, 1270 (D.N.J.1987). However, reviewing courts should not simply rubber stamp magistrate's conclusions. *See, e.g., Tehfe, supra*, 722 F.2d at 1114.

■ Here, in assessing whether to grant the first search warrant, the magistrate had before him Detective Jordan's affidavit. The affidavit revealed that the Toubys had a residence and two post office boxes for their business. Clearly, a nontechnical, common sense inference from these facts was that evidence of the counterfeiting and forgery charges and of the charges concerning the substances and their attendant paraphernalia would be found at the Touby residence; the only place, drawing a reasonable inference from the affidavit, where such materials could be stored. Accordingly, the affidavit provided the magistrate with a substantial basis for concluding that

a reasonable person would believe that the instrumentalities or evidence of the Toubys' alleged crimes would be found at the Touby residence. I will, therefore, deny the defendants' motion to suppress the evidence from these searches since I find that the first warrant issued upon probable cause.

I note, in passing, that the defendants have not independently questioned the propriety of the second search, apart from its alleged taint by way of the initial search. I observe that, were this point in issue, there was probable cause for the second search based on Detective Jordan's January 7th affidavit that hazardous materials and paraphernalia were present at the Touby residence based on the observations made during the first search.

### B. Good–Faith Exception

■ I note further that even if there was no probable cause to support the searches, I still would not grant the defendants' request to suppress the evidence from the two searches. Under *United States v. Leon*, 468 U.S. 897, 920, 104 S.Ct. 3405, 3419, 82 L.Ed.2d 677 (1984), suppression is not required where "an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope."

*Leon* requires suppression:

(1) where the affiant intentionally or recklessly misleads the magistrate; or

(2) where the magistrate abandons his or her objective judicial role; or

(3) where the affidavit is so lacking in probable cause that an officer could not reasonably rely on the warrant; or

(4) where the warrant utterly fails to meet particularization standards.

*Id.* at 923, 104 S.Ct. at 3421; *Vastola*, 670 F.Supp. at 1270.

The defendants rely on prongs one and/or three in their argument against the good-faith exception. Neither one of these contentions are persuasive. The defendants have not shown that Detective Jordan intentionally or recklessly misled the magistrate nor that the affidavit lacked indicia of probable cause.

The information in the affidavit, indicating that defendants had only a home address and no other business address, with the exception of certain post office boxes plus prior similar offenses and the detective's observations linking him to the counterfeiting and forgery offenses, was sufficient indicia of probable cause and easily demonstrates that Detective Jordan was neither intentionally nor recklessly misleading the magistrate. Detective Jordan conducted his duties in a diligent and reasonable fashion; just the conduct which *Leon* was meant to protect. *See* 468 U.S. at 921, 104 S.Ct. at 3419 ("Penalizing the officer for the magistrate's error, rather than his own, cannot logically contribute to the deterrence of Fourth Amendment violations." (footnote omitted)).

I note that if the second search was independently, not derivatively, at issue, I would find that that search was under the good-faith exception as well, because the defendants have not shown intentional or reckless misleading of the magistrate as to the second search, nor that there was not indicia of probable cause for the second search.

Hence, even were I not to find that probable cause existed, I would not suppress the evidence garnered from the two searches because the searches fall, foursquare, within the good-faith exception articulated in *Leon, supra*.

### C. Summary

I deny the defendants' motion to suppress the evidence of the searches because the magistrate properly found probable cause to support the warrant. I further note that the searches would fall within the *Leon* good-faith exception.

### CONCLUSION

In conclusion, I deny defendants' motions to dismiss the indictment and to suppress the evidence from the searches.