**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Ernest INFELICE and Mario Garelli,
Defendants-Appellants.**

**Nos. 73–2130, 73–2131.**

United States Court of Appeals,
Seventh Circuit.

Argued June 6, 1974.

Decided Aug. 8, 1974.

Julius Lucius Echeles, Sam Adam, Chicago, Ill., for defendants-appellants.

James R. Thompson, U. S. Atty., Gary L. Starkman and Jeremy D. Margolis, Asst. U. S. Attys., Chicago, Ill., for plaintiff-appellee.

Before CLARK, Associate Justice,* SPRECHER, Circuit Judge, and BEAMER, District Judge.**

BEAMER, District Judge.

Defendants were charged along with four other persons in a four-count indictment with violations of 21 U.S.C. §§ 841(a)(1) and 846.[1] Count I charged Ernest Infelice, Mario Garelli, Chester Garelli, Frank Sarris, Ernest Brown and James McGarry with conspiracy to distribute heroin and to possess heroin with intent to distribute in violation of § 841 (a)(1). The remaining counts charged Infelice, the two Garellis and Sarris with distributing 1.05 and 275.96 grams of heroin on April 14, 1972, and 293.3 grams of heroin on April 27, 1972. Appellants *Infelice* and *Mario Garelli* were found guilty on all four counts after a court trial and each was sentenced to concurrent terms of ten years on each count,

---

* Associate Justice Tom C. Clark of the Supreme Court of the United States (Retired) is sitting by designation.

** District Judge George N. Beamer of the Northern District of Indiana is sitting by designation.

1. § 841(a)(1) provides:
 "(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—
 (1) to manufacture, distribute or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;
 . . . ."

"Controlled substance" is defined in § 802 (6) as a drug or other substance, or immediate precursor, included in schedules established by 21 U.S.C. §§ 811–812.
§ 846 provides:
"Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

together with mandatory parole periods on the substantive counts.[2]

On this appeal both defendants contend that (1) heroin was not a "controlled substance" during the time alleged in the indictment because the schedules of controlled substances were not updated and published in the Federal Register as required by § 812(a); (2) the court used an improper standard in evaluating the evidence by refusing to consider tapes of "Kel-set" recordings which had been admitted into evidence; (3) there was insufficient evidence as a matter of law; and (4) the denial of Infelice's motions for polygraph testing of himself and a Government witness constituted an abuse of discretion. In addition, Garelli claims that the "Kel-set" evidence was procured in violation of Illinois law and should not have been admitted, that he was deprived of his sixth amendment right to confront witnesses with respect to the Government's key witness, and that the court erred in allowing voice identification of him based on statements allegedly received in violation of his rights to counsel and due process of law.

The Government's case was built upon the testimony of an informer, Robert Burks. Though the structure of defendants' challenges to the sufficiency of the evidence differ, the arguments of both defendants hinge upon their claim that the trial court improperly credited the testimony of Burks. Infelice argues that the evidence of the Kel-set tapes destroyed Burks' credibility while Garelli contends that the failure of Burks' memory on cross-examination rendered his testimony unreliable.

Burks testified that he had negotiations with Brown in October of 1971 during which he asked when he could see "Crip" (identified by Burks as Mario Garelli) to purchase narcotics. Brown said that he would take Burks'

money to Crip and that Mario had said that "old friends would meet later." After learning from Brown that Crip worked at McCormick Place, Burks found Garelli there on October 20, 1971, and Garelli acknowledged that Burks was doing business with Brown. The next day Burks told Garelli that he feared Brown would rob him, and Garelli said Burks could deal directly with him.

On October 26, 1971, Burks saw Infelice, was directed to Garelli, and showed Garelli $5,000.00. Garelli asked how much Burks expected and was told "a pound and an eighth." Garelli said his "stuff" was good and that he was waiting for his connection. He told Burks to show Infelice the money because he "would be proud of you." When Burks showed the money to Infelice, Infelice told him not to part with it until he had "the dope in the palm of [his] hand."[3]

During the week of November 7, Infelice told Burks that Garelli should have his package soon; Garelli later told Burks the same thing. Chester Garelli who was with Mario, told Burks they had given Brown a fourth of a "kilo." On November 18, 1971, Chester told Burks that "the package" would arrive in ten days and that it would be very strong.

On January 5, 1972, Infelice told Burks that Mario and Chester had gone to New York to "cop" (which Burks explained as meaning a purchase of narcotics) and that Infelice himself had just returned from Florida where he had gone to "cop." He agreed to have Mario call Burks upon his return. On January 12, Infelice told Burks he had given Mario the phone number; Burks went to Mario, asked if he had been to New York to "cop" and Mario said he had gone but had gotten nothing. He assured Burks that he would be the first to know when Mario was able to obtain

---

2. Brown was severed from the other defendants prior to trial; Chester Garelli and Sarris entered guilty pleas during the course of the trial, and McGarry was acquitted at the close of the Government's case.

3. Tr. at 76.

something. Burks again saw Mario on January 28, was directed to Chester, and obtained a package which proved to be ground glass. On February 2 Burks told Infelice that Chester had given him glass; Infelice said he couldn't understand it and that he knew Mario wouldn't give "bad stuff." [4]

Chester called Burks on April 13, told him he had a package and asked Burks to meet him at the corner of Austin and Madison Streets. Chester was with Sarris, and Sarris told Burks he would sell a quarter kilo for $10,000.00. Burks requested a sample and Sarris said he would call the next day. Sarris delivered the package the next day and told Burks he was dealing with him on the strength of Mario and Chester. The sample contained heroin. On April 15 and 27 Sarris delivered packages to Burks containing heroin in excess of 250 grams each.

On May 12, Burks complained to Infelice about the quality of the heroin and Infelice said, "You know that we wouldn't do you like that, that we wouldn't give you no bad stuff." [5] Infelice said he would have Mario call Burks. On June 7, Infelice told Burks he had told Mario to call, that someone was messing with the package and that Mario wouldn't sell "bad stuff." Burks then went to Chester, told him the narcotics were bad and Chester asked Burks if he would think Chester and Mario were honorable if they gave him 45 "spoons" for $3,000.00. Chester said Mario would have Sarris contact Burks and that Chester would stitch the bag to insure against tampering. Two days later Burks conversed with Sarris who said the price would be $5,000.00. No transaction was ever consummated from these final negotiations.

Though Burks was surveilled on several of these occasions, his testimony as to the conversations which occurred was in the main uncorroborated. On certain occasions when he was equipped with a "Kel-set" the machine malfunctioned; the court found the tapes to be very poor in quality, with long periods of hissing and silence.

### I

■ Three of defendants' claims are interrelated. The Government introduced into evidence the tape recordings of conversations between Burks and others made by use of the Kel-set radio transmitter concealed on Burks and taped by agents from a radio receiver. Defendants contend that the trial court used an improper standard in evaluating the evidence by refusing to consider these tapes where they allegedly impeached the testimony of Burks. Reliance is placed on the district judge's statement that he "virtually disregarded them." The court, defendants contend, effectively struck relevant evidence from the record. We do not read the court's comments as a reflection upon the admissibility of the taped conversations, but only upon the probative weight he chose to give them. It is clear from the trial judge's comments that he did not cavalierly disregard the evidence as defendants suggest. The court specifically mentioned inconsistencies between the tapes and Burks' testimony and discussed those parts of Burks' testimony which constituted added material from what appeared on the tape. The court plainly indicated that the tapes were offered as independent evidence of the conversations monitored, that at least in certain instances they contradicted the Government's case and that, especially in light of the absence of explanation, the absence of words on the tapes constituted evidence they were not spoken. However, because of the poor quality of the tapes, with long periods of unexplained hissing and silences, and the failure of the Government to obtain Burks' identification of the speakers, the court found the tapes of "scant value." The trial judge viewed the case as depending upon the credibility of Burks, and the court chose to believe Burks in spite of the tapes. In context, it is clear that the

---

4. Tr. at 119.

5. Tr. at 160.

judge "virtually disregarded" the tapes as evidence against defendants and considered them only for their impeachment value.

 Garelli asserts that the evidence was insufficient because of the unreliability of the tapes and because of the lack of credibility of Burks which was revealed by his inability to answer questions on cross-examination. Garelli asserts also that the "lapse of memory" by Burks on cross-examination deprived Garelli of his sixth amendment right to confront witnesses. The determination of whether a defendant's sixth amendment right to confrontation has been violated depends upon whether defendant has been deprived of the right to test the truth of the direct testimony. United States v. Rogers, 475 F.2d 821, 827 (7th Cir. 1973). Burks' lapse of memory here is not comparable to a refusal to answer questions as in United States v. Cardillo, 316 F.2d 606 (2nd Cir. 1963). Nor is it equivalent to a denial of the right to examine a witness as in Smith v. Illinois, 390 U.S. 129, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968). See United States v. Insana, 423 F.2d 1165, 1168 (2nd Cir. 1970), cert. denied, 400 U.S. 841, 91 S.Ct. 83, 27 L.Ed.2d 76; California v. Green, 399 U.S. 149, 188–189, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (concurring opinion of Justice Harlan). Garelli was not deprived of the right to test the knowledgeability and credibility of Burks, and thus he was not deprived of his sixth amendment rights.

Garelli is correct in claiming that the informer's weak memory casts doubt upon his credibility. Burks' lapse of memory was explained by him as caused by the confusing number of dates mentioned by Garelli's counsel.[6] Nevertheless, the trial judge was well aware that Burks stated with "disturbing frequency that he did not recall what was said by who, when, or where." However, as the trial judge noted, cross-examination centered on dates in November, 1971 and 1972 when Burks had little or no contact with Garelli rather than upon the important meetings in October of 1971.[7]

In his findings of fact, Judge Marshall concluded:

> I observed Burks while he testified, twice on direct, and under extensive cross-examination. I believed him. I am persuaded beyond a reasonable doubt of the guilt of Ernest Infelice and Mario Garelli.[8]

 It is not our function to weigh the evidence or determine the credibility of witnesses. United States v. Miles, 401 F.2d 65, 67 (7th Cir. 1968). The trial judge determined that Burks' testimony was credible in spite of his difficulties in recollection upon cross-examination[9], and we see no basis for substituting our judgment for that of the trial judge who heard the evidence.

6. Garelli relies on the fact that Burks was "unable to recall" whether he had conversations with Garelli on cross-examination or the content of such conversations on January 5, 12, and 28, 1972; February 2 and 4, 1972; April 14, 1972, and May 12, 1972, and that he was unable to recall the content of a November 18, 1971 conversation with Mario Garelli. But of these dates, Burks only testified on direct examination that he had conversations with Garelli on January 12 and 28, 1972.

7. Garelli insists that Burks' inability to state his address and place of employ destroys his credibility. However, Burks stated he lived in the 2200 block of West Division Street and worked for a Mr. Ernest at a clothing store on South Wabash Avenue. (Tr. 198–217). Though Burks did state that

he could not remember whether he had more than one unrecorded conversation with Garelli in October, he did not, as Garelli contends, state that he was unable to recall whether he had a conversation with Garelli on October 20 or what the conversation concerned. (Tr. 477–481).

8. Tr. at 25.

9. Garelli agrees with the trial judge that the corroboration of the October 26 statements of Garelli on the tapes should be given little weight apart from the testimony of Burks, but disagrees with the judge's assessment of Burks' credibility. In addition to the testimony of Burks, as corroborated by the tapes in part, the conversations between Burks and Brown were overheard and corroborated by Agent James.

■ Garelli insists that witness demeanor is an insufficient basis to support the testimony of Burks, relying on Jackson v. United States, 122 U.S.App. D.C. 324, 353 F.2d 862 (1965). The court there found that the action of police officers in arresting two men and searching the wrong one first made their testimony as to the description of the suspect allegedly received from an informant "inherently incredible." There is nothing in the testimony of Burks which is inherently improbable, and it was not, under the circumstances, too weak and incredible to accept. The trial judge here made the determination of Burks' credibility after careful consideration of the factors militating against his credibility which are raised by defendants—his past background, his possible interest in the outcome, the consistency of his testimony, both internally and in relation to other evidence, and his responses on cross-examination. Accordingly, we are unable to find that the trial judge erred in crediting the testimony. *See* United States v. Adams, 454 F.2d 1357 (7th Cir. 1972), cert. denied, 405 U.S. 1072, 92 S.Ct. 1523, 31 L.Ed.2d 805; United States v. White, 470 F.2d 170 (7th Cir. 1972).

■ ■ The existence of silence on part of the tapes was not a circumstance which was fatal to the Government's case against Infelice or which foreclosed reliance on Burks' testimony by the trial judge.[10] It was the function of the trial judge to determine the probative effect of the silences on the tapes in relation to the credibility of the testimony of Burks. Questions of credibility have no bearing on the insufficiency of the evidence as a whole and are not for the reviewing court's decision. United States v. Karigiannis, 430 F.2d 148, 151 (7th Cir. 1970), cert. denied, 400 U.S. 904, 91 S.Ct. 143, 27 L.Ed.2d 141. As the court stated in United States v. Miles, 401 F.2d 65, 67 (7th Cir. 1968):

> The court as the trier of the fact, in this case, must use its experience with people and events, weighing the probabilities presented by the evidence. Thus, assuming that in reaching its decision the court has "problems" with the evidence, its judgment reflects a weighing of all the evidence. If, by its judgment, the court is convinced beyond a reasonable doubt, we can require no more.

We find no error in the trial court's findings of guilty based on the testimony of Burks.

## II

■ The defendants' contention with respect to the publication of schedules of controlled substances was recently considered in United States v. Nocar, 497 F.2d 719 (7th Cir. 1974). 21 U.S.C. § 812(a) provides for republishing of schedules of controlled substances on a semiannual basis during the two-year period beginning one year after the enactment of the subchapter.[11] In response to the claim that schedules should have

---

10. Though defendant Infelice stresses the lack of corroboration of Burks' testimony on the tapes, the October 26, 1971 tape corroborated Burks' testimony that Infelice told him not to give up his money until he got "it" in his hand. Infelice testified that it was his voice on the February 2, 1972, tape which responded to Burks' complaints about powdered glass by saying he didn't think anyone would do that; he also testified it could have been his voice on the May 12 tape discussing the possibility that Sarris had tampered with the package. In addition, though the trial judge indicated that the corroboration of Agent James of the remainder of the May 12 conversation "does tax my credulity," he did not indicate that he disbelieved it. The only contradiction between the tapes and Burks' testimony, other than implication from silence, is Burks' testimony that he asked Infelice on January 12 whether he gave Burks' number to Mario; the tape indicated that Infelice gave Burks the number of Garelli.

11. In pertinent part, § 812(a) provides:

"There are established five schedules of controlled substances, to be known as schedules I, II, III, IV and V. Such schedules shall initially consist of the substances listed in this section. The schedules established by this section shall be updated and republished on a semiannual basis during the two-

been republished on October 27, 1971, one year after the enactment of Subchapter I of the Comprehensive Drug Abuse Prevention and Control Act of 1970, Judge Pell, speaking for the Court in *Nocar*, stated:

> We disagree with the defendants' reading of section 812(a). The second sentence of the provision does not require republication on October 27, 1971. Rather, it directs that that date be used to determine when, during the following two years, the six-month demarcations are to fall. Therefore, the first republication was due on April 27, 1972, eighteen months after the enactment of the subchapter and one half year after the first anniversary. 497 F.2d at 723. °

The last of the overt acts of the conspiracy and the last of the substantive offenses charged in the indictment here occurred on April 27, 1972. Therefore, the alleged violations of the law occurred before or on the day set by statute for updating and republishing the schedules, and a valid prohibition was in force.

### III

■■ Defendants contend the trial judge erred in denying motions for polygraph examinations of defendants and Burks, arguing that current practice and usage indicate the high scientific repute of polygraph testing. It is clear that the admission of such evidence is within the discretion of the trial judge. United States v. Chastain, 435 F.2d 686 (7th Cir. 1970). The appointment of a polygraph examiner also lies within the judge's discretion. United States v. Penick, 496 F.2d 1105 (7th Cir. 1974). Since both the appointment of a polygraph examiner and the admission in evidence of the results are discretionary, it follows that the judge had discretion to deny the test. Appellants have cited no cases—and we have found none—that hold that the refusal to order a polygraph examination is an abuse of discretion.

### IV

■ Garelli contends that the Kel-set transmissions and recordings constituted electronic eavesdropping and overhearing contrary to Illinois law which prohibits use of an eavesdropping device to hear or record conversations except with the consent of any one party to the conversation and at the request of a State's attorney. Ill.Rev.Stat. Ch. 38, § 14–2(a). The question of admissibility does not turn upon whether evidence was obtained in violation of state law. Federal law governing the admissibility of evidence in federal criminal trials permits the introduction of such tape recordings. United States v. Escobedo, 430 F.2d 603, 607 (7th Cir. 1970), cert. denied, 402 U.S. 951, 91 S.Ct. 1632, 29 L.Ed.2d 122; United States v. Teller, 412 F.2d 374 (7th Cir. 1969), cert. denied, 402 U.S. 949, 91 S.Ct. 1603, 29 L. Ed.2d 118; 18 U.S.C. §§ 2511(2)(c), 2517(3).

### V

Garelli's last argument is that voice identification by Agent James deprived him of his right to counsel and due process. Agent James arrested Garelli after indictment, and Garelli responded "yes" to the question of whether he understood the constitutional rights read to him. James had earlier overheard a transmitted conversation which occurred on October 26, 1971, between Burks and another person. At trial he testified that he recognized the voice he heard on October 26 as that of Garelli on the basis of Garelli's responses at the time of his arrest.

First, Garelli was not deprived of his right to counsel because the confrontation which occurred was not a "critical" one requiring counsel to compensate for advantages of the prosecuting authorities. The conversation on which James based his identification was preserved on tape which eliminated the risk of unintentional suggestion and impediments to confrontation at trial. "If accurate re-

---

year period beginning one year after the date of enactment of this subchapter and

shall be updated and republished on an annual basis thereafter."

construction is possible, the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the confrontation to cease to be 'critical.'" United States v. Ash. 413 U.S. 300, 316, 93 S.Ct. 2568, 2577, 37 L. Ed.2d 619 (1973). As the Supreme Court indicated in United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) with respect to equivalent matters of handwriting examples and blood tests:

> Knowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts.

388 U.S. at 227–228, 87 S.Ct. at 1933.

We therefore conclude that Garelli was not deprived of his right to counsel by the voice identification procedures followed by Agent James. Cases cited by the defendant involving the fifth amendment have no application to voice identification. United States v. Dionisio, 410 U.S. 1, 93 S.Ct. 764, 35 L. Ed.2d 67 (1973).

Garelli also argues that the confrontation violated his right to due process under Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Since the identification by James was made with reference to a recorded conversation, the confrontation was not conducive to irreparable misidentification.[12] Therefore, the identification by James did not deny Garelli due process of law. *See* United States v. Ryan, 478 F.2d 1008 (5th Cir. 1973).

Accordingly, the judgments of conviction will be affirmed.

Affirmed.

12. In addition, it is arguable that such a show-up is for the purpose of arrest rather than identification and was therefore imperative. *See Stovall, supra,* at 302.