In the

# United States Court of Appeals

## For the Seventh Circuit

No. 06-1696

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ARTURO GALLO-MORENO,
also known as FERNANDO CARRION,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 94-CR-458—**Charles R. Norgle, Sr.**, *Judge.*

ARGUED NOVEMBER 3, 2008—DECIDED OCTOBER 19, 2009

Before KANNE, EVANS, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*.   In 1994 Fernando Carrion was indicted for his involvement in a large-scale drug conspiracy in Chicago, and a warrant was issued for his arrest. Three years later Arturo Gallo-Moreno was arrested on suspicion of being Carrion. Gallo-Moreno's resulting bench trial focused primarily on the issue of identity—whether Gallo-Moreno was Carrion—and the

district court found Gallo-Moreno guilty on the drug-conspiracy and related narcotics charges. On appeal Gallo-Moreno advances three reasons why we should reverse his convictions. He argues that the district court improperly admitted evidence regarding an uncharged attempted drug transaction in Texas in violation of Rule 404(b) of the *Federal Rules of Evidence*. He also contends that DEA Agent Rafael Tovar's testimony identifying him as Carrion should have been suppressed. On this point he makes two separate constitutional arguments: He claims Tovar's out-of-court identification was unduly suggestive and unreliable in violation of his Fifth Amendment right to due process and that it independently violated his Sixth Amendment right to counsel.

We affirm. Gallo-Moreno's Rule 404(b) argument fails because identity was the sole issue at trial and the evidence regarding the Texas drug transaction was highly probative on that issue. We also reject Gallo-Moreno's due-process challenge to Tovar's identification testimony because the identification was sufficiently reliable under the circumstances of the case.

Gallo-Moreno's Sixth Amendment challenge to the identification presents a more difficult question. Carrion's voice was captured on tape in several recorded telephone calls during the DEA's investigation of the 1994 conspiracy. Tovar participated in some of these calls in an undercover capacity. After Gallo-Moreno was arrested on suspicion of being Carrion, Tovar listened to the recordings in anticipation of attempting a voice identification. The next day he transported Gallo-Moreno from

jail to the DEA to obtain voice exemplars from him. While waiting for the exemplar procedure to begin, he engaged Gallo-Moreno in casual conversation and recognized his voice as Carrion's.

This identification occurred postindictment and Gallo-Moreno's lawyer was not present. Under *United States v. Wade*, 388 U.S. 218 (1967), such an identification is inadmissible if it was made during a "critical stage" of the criminal proceedings requiring the presence of counsel under the Sixth Amendment. *Wade*'s holding, however, must be understood in light of the Supreme Court's later decision in *United States v. Ash*, 413 U.S. 300 (1973). Read together, the two cases suggest the following approach to the question whether a postindictment identification occurred at a critical stage of the proceedings requiring the presence of counsel: First, we ask whether the identification occurred when the defendant himself was present in a trial-like confrontation; and, second, we ask whether any errors or overreaching that may have infected the identification can be "cured" through the presence of counsel at trial.

Here, Gallo-Moreno was present in person, without counsel, when Tovar made the identification; we may leave to one side, however, whether the confrontation was sufficiently trial-like to trigger the right to have counsel present. Under the circumstances of this case, Gallo-Moreno had sufficient opportunity to expose any errors in Tovar's identification through counsel at trial. Carrion's participation in the conspiracy was captured on audiotape, and Tovar's identification was based solely

on his study of Carrion's voice on the tapes. Tovar's identification was only as strong as the tapes, which were admitted into evidence, and any flaws in the identification could be adequately exposed through cross-examination by counsel at trial. Accordingly, the postindictment, uncounseled identification did not occur during a critical stage of the criminal proceedings under *Wade* and *Ash*, and Gallo-Moreno's Sixth Amendment right to counsel was not violated.

## I. Background

In 1994 Jose Antonio Varela, a DEA confidential informant, and Rafael Tovar, an undercover DEA agent, set up a large undercover cocaine transaction with Mexican drug traffickers. The DEA arrested several conspirators in Chicago after a July 1994 delivery of roughly 350 kilograms of cocaine. Later the same day a man named "Fernando Carrion" contacted Tovar. Oblivious to his coconspirators' arrests, Carrion called himself "the boss of all those people who are there by you" and sought to reach Varela, the known cocaine purchaser, for an additional large sale of cocaine. Over the next month Carrion spoke with Tovar, Varela (who was using a false name), and another DEA agent. The conversations between Carrion and government operatives took place over the phone; nobody ever saw Carrion. The agents recorded several of these conversations and generated about 30 minutes' worth of audiotapes. In December 1994 the government obtained an indictment charging Carrion and others with one count of conspiracy to possess cocaine with intent

to distribute and three counts of possession of cocaine with intent to distribute. A warrant issued for Carrion's arrest.

In 1997 Varela was in Texas trying to purchase cocaine in an unrelated undercover drug operation. Using the name "Jose Ballesteros," Varela met with Arturo Gallo-Moreno to negotiate the purchase and importation of 3,000 kilograms of cocaine from Mexico to Chicago. Gallo-Moreno was introduced to Varela as the "real big boss," and he told Varela, "I'm the one who gives the orders." During their meeting, Gallo-Moreno and Varela recognized each other's voices. Gallo-Moreno asked Varela (who was using the alias "Ballesteros") whether he had ever heard the name "Jose Antonio Varela" mentioned. Gallo-Moreno explained, "You know, that guy [Varela] got a lot of our people busted up there in Chicago, and about one ton of cocaine. . . . [I]f you know about him, tell me so that I can have him killed." Shortly after this meeting, Varela informed the authorities that Gallo-Moreno was Carrion.

Based on the 1994 warrant for Carrion, DEA agents arrested Gallo-Moreno on August 25, 1997, at O'Hare Airport in Chicago as Gallo-Moreno was arriving to meet "Ballesteros" to complete their transaction. Gallo-Moreno was arraigned the following day and pleaded not guilty to the charges against Carrion. Two years later the government obtained a superseding indictment charging Gallo-Moreno with a host of drug-related crimes, all of which concerned Carrion's participation in the 1994 conspiracy.

Because nobody had seen Carrion, the government had to establish Gallo-Moreno's identity as Carrion in part through voice identification. Gallo-Moreno agreed through counsel to provide a voice exemplar. The procedure was scheduled for October 17, 1997, and Gallo-Moreno's counsel was to be present. The day before this planned meeting, prosecutors had Tovar listen to the 1994 recordings of Carrion for four to six hours. On the day the exemplar was to be taken, Tovar and another agent retrieved Gallo-Moreno from the Metropolitan Correctional Center in Chicago and transported him to the Chicago DEA office to await the scheduled voice-exemplar procedure. Tovar had been instructed not to speak with Gallo-Moreno about the case. While waiting for Gallo-Moreno's counsel to arrive and the exemplar procedure to begin, Tovar conversed with Gallo-Moreno in Spanish about the weather and a recent earthquake in Mexico. Tovar immediately identified Gallo-Moreno as Carrion and alerted a nearby agent that they had arrested the right man. Gallo-Moreno then became silent. For an unrelated reason, Gallo-Moreno's lawyer cancelled the exemplar session that day. Much later, in March 2001, Gallo-Moreno recorded two tapes of voice exemplars while in the presence of his counsel and Tovar.

The case went to a bench trial focused mostly on whether Gallo-Moreno was Carrion. Tovar testified that he had identified Gallo-Moreno as Carrion from hearing his voice during their interaction on October 17, 1997, and based on his review of the 2001 voice exemplars. Valera offered testimony about his 1997 encounter with Gallo-Moreno in Texas; he identified Gallo-Moreno as Carrion

based on the Texas encounter and the 2001 exemplars. The government also called an interpreter whom Gallo-Moreno had previously hired; the interpreter testified that Gallo-Moreno sounded like Carrion but said she was not certain. Gallo-Moreno called two of his former lawyers who testified that Gallo-Moreno's voice did not sound like Carrion's. The district court found Gallo-Moreno guilty and sentenced him to 300 months in prison. This appeal followed.

## II. Discussion

Gallo-Moreno argues that the evidence related to his 1997 Texas encounter with Varela should have been excluded under Rule 404(b) of the *Federal Rules of Evidence.* He also contends that Tovar's identification of him as Carrion violated his Fifth Amendment right to due process and his Sixth Amendment right to counsel and should have been suppressed.

### A. Rule 404(b) and the Evidence of the 1997 Meeting in Texas

We start with Gallo-Moreno's evidentiary challenge to the testimony regarding Varela's attempted drug transaction with Gallo-Moreno in Texas in 1997. Rule 404(b) generally excludes "[e]vidence of other crimes, wrongs, or acts" used "to prove the character of a person in order to show action in conformity therewith." FED. R. EVID. 404(b). Such evidence "may, however, be admissible for other purposes, such as proof of . . . identity." *Id.* We

review the court's decision to admit evidence under Rule 404(b) for an abuse of discretion.[1] *United States v. Moore*, 531 F.3d 496, 499 (7th Cir. 2008). Gallo-Moreno contends that the Texas evidence simply shows that he is a drug dealer and is more likely to be Carrion for reasons related only to propensity, in violation of Rule 404(b)'s restriction on the use of propensity-based evidence. The government responds that the evidence is highly probative of Gallo-Moreno's identity and thus was properly admitted under Rule 404(b).

We agree with the government. Identity was the sole issue at trial. The Texas evidence established that Gallo-Moreno recognized Varela's voice, knew of a "Jose Antonio Varela" by name, expressed a desire to kill Varela, said that Varela got a lot of "our people" busted, intimated that the seized cocaine was his, and used similar language as Carrion. This evidence tended to prove Gallo-Moreno's identity as Carrion, and none of

---

[1] The government argues that Gallo-Moreno forfeited his Rule 404(b) objection because he objected only on relevance grounds. Our cases appear to be inconsistent as to whether an objection on relevance grounds encompasses a Rule 404(b) argument. *Compare United States v. Gibson*, 170 F.3d 673, 677 (7th Cir. 1999) (finding forfeiture under similar circumstances), *and United States v. Laughlin*, 772 F.2d 1382, 1392 (7th Cir. 1985) (same), *with United States v. Joseph*, 310 F.3d 975, 977 (7th Cir. 2002) (finding Rule 404(b) argument preserved). We need not resolve this inconsistency because even if we assume Gallo-Moreno preserved his Rule 404(b) argument, his argument fails on the merits.

it requires a forbidden propensity-based inference to conclude that Gallo-Moreno is Carrion.

Gallo-Moreno responds that the Texas evidence only shows he had "generic knowledge" of "one of the largest and most uniquely significant seizures" of cocaine in the Northern District of Illinois. He also explains his use of the word "our" (as in "our people") as referring to "any number of groups with whom Mr. Gallo-Moreno associated himself" or to "those involved in drug-trafficking [broadly]." To the contrary, the Texas evidence was far more specific—and specifically related to proving his identity—than Gallo-Moreno suggests. His knowledge of Varela and certain specific facts surrounding the activities of coconspirators in Chicago in 1994 is highly probative of his identity as Carrion. The same is true of Varela's testimony about the similarities between Gallo-Moreno's speech and Carrion's. The district court did not abuse its discretion in admitting this evidence.

## B. Fifth Amendment Right to Due Process

Gallo-Moreno argues that Tovar's identification of him as Carrion violated his Fifth Amendment right to due process. He contends that the government "primed" Tovar to identify him as Carrion by telling Tovar that Carrion was in custody and that Tovar understood that he was expected to make a positive identification. Gallo-Moreno also claims that the identification was based on unduly suggestive procedures and was unreliable under the totality of the circumstances, violating his due-process rights. The district court rejected Gallo-Moreno's Fifth Amendment argument, and we review the district

court's decision de novo. *United States v. Hawkins*, 499 F.3d 703, 707 (7th Cir. 2007).

In the context of witness identifications, the Supreme Court has explained that "[i]t is the likelihood of misidentification which violates a defendant's right to due process." *Neil v. Biggers*, 409 U.S. 188, 198 (1972). *Manson v. Brathwaite*, 432 U.S. 98 (1977), holds that an identification based on a suggestive identification procedure does not automatically establish a constitutional violation. *Id.* at 109. Instead, the ultimate question is whether the identification was nonetheless reliable, which "is the linchpin in determining the admissibility of identification testimony." *Id.* at 114. The Court in *Brathwaite* identified several factors that inform the determination of an identification's reliability:

> The factors to be considered [in determining reliability] . . . include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.

*Id.* (citing *Biggers*, 409 U.S. at 199-200).

In reviewing a due-process challenge to an identification, we undertake a "well-settled, two-pronged analysis: (1) whether the [out-of-court identification] process was unduly suggestive, and (2) if so, whether the identification was nevertheless sufficiently reliable." *United*

*States v. Recendiz*, 557 F.3d 511, 524 (7th Cir. 2009); *accord Hawkins*, 499 F.3d at 707. "Our role . . . is to determine whether the identification was so unreliable that the defendant's constitutional right to a fair trial should have precluded its admission." *Recendiz*, 557 F.3d at 524.

We need not address whether the procedures underlying Tovar's identification were unduly suggestive because "under the totality of the circumstances, the identification was nonetheless reliable." *Hawkins*, 499 F.3d at 707. As the Second Circuit has observed, "[w]itnesses who listen to a crime that has been memorialized on tape are in a position to offer uniquely reliable testimony." *Brown v. Harris*, 666 F.2d 782, 786 (2d Cir. 1981) (internal citation and quotation marks omitted). That observation is fully borne out in this case. Applying the factors set forth in *Biggers* and *Brathwaite*, we note first that Tovar spent four to six hours listening and relistening to 30 minutes' worth of tape recordings of Carrion's voice. This exhibits a lengthy opportunity to observe and a high degree of attention on Tovar's part—well above that of the typical crime victim or witness. Tovar studied the tapes knowing that the government expected him to attempt a voice identification and that he would be subjected to cross-examination if he positively identified "Carrion." Further, Tovar's status as a DEA agent bolsters our conclusion about his degree of attention, *see Brathwaite*, 432 U.S. at 115; *United States v. Jones*, 454 F.3d 642, 649 (7th Cir. 2006), as does the fact that Tovar "ha[d] the luxury of listening to the tape in an office, where [he] can devote [his] full attention to it," *Brown*, 666 F.2d at 786. Also, Tovar immediately

expressed certainty that Gallo-Moreno was Carrion after hearing his voice. Finally, a mere day elapsed between his review of the tapes and the subsequent identification. That Tovar did not describe Carrion's voice prior to his identification does not undermine the strength of the other reliability factors.

We reached a similar conclusion in *United States v. Alvarez*, 860 F.2d 801, 809-11 (7th Cir. 1988). There, FBI agents spent hundreds of hours listening to a defendant's voice on tape before identifying the defendant. We held that under the *Biggers* factors the identification was reliable, and therefore we rejected the defendant's due-process challenge to the agents' identifications. Gallo-Moreno tries to distinguish *Alvarez* by observing that the agents in *Alvarez* spent hundreds of hours reviewing the tapes while Tovar spent only four to six hours reviewing Carrion's tapes. This is not a meaningful distinction. Four to six hours of careful study is plenty of time to become familiar with a voice on a tape; hundreds are not needed for the identification to pass constitutional muster.

Our recent decision in *United States v. Recendiz*, 557 F.3d 511, also supports our holding. There, a DEA agent was instructed to listen to a six-minute call "in order to do a voice recognition." *Id.* at 527. Applying the *Biggers* factors, we likewise rejected the defendant's due-process challenge to the identification. We said that the six-minute call had offered the agent "a clear opportunity to listen to the [defendant's] voice." *Id.* at 528. We also noted that the "special agent [knew] his recollection

would be subject to close scrutiny at trial, [so he] devoted proper attention to the call, making him nothing like 'a casual or passing observer.' *Brathwaite*, 432 U.S. at 115." *Id.* The same reasoning applies to the identification at issue here. Accordingly, we reject Gallo-Moreno's Fifth Amendment challenge to the admissibility of Tovar's identification.

### C. Sixth Amendment Right to Counsel

Gallo-Moreno also contends that the identification—made while he and Tovar were engaged in small talk before the voice-exemplar procedure was to begin—violated his Sixth Amendment right to counsel. He argues that the government essentially engineered an aural in-person "showup" identification, which amounted to a "critical stage" of the criminal proceedings requiring the presence of counsel. The district court rejected Gallo-Moreno's Sixth Amendment challenge to the identification, and we review that determination de novo. *United States v. Spruill*, 296 F.3d 580, 585 (7th Cir. 2002).

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." U.S. CONST. amend. VI. "[O]nce the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings." *Montejo v. Louisiana*, 129 S. Ct. 2079, 2085 (2009) (citing *Wade*, 388 U.S. at 227-28). Gallo-Moreno had been indicted and arraigned, and

thus the "judicial process ha[d] been initiated" for Sixth Amendment purposes when Tovar made his identification. Gallo-Moreno was present in person but his counsel was not. Whether this was a Sixth Amendment violation turns on whether Tovar's identification occurred at a "critical stage" of the criminal proceedings.

Two Supreme Court cases—*United States v. Wade*, 388 U.S. 218 (1967), and *United States v. Ash*, 413 U.S. 300 (1973)—control this inquiry. *Wade* held that a postindictment identification of a defendant at a lineup is a critical stage of a criminal proceeding and requires the presence of defense counsel. *Ash* held that a postindictment identification of a defendant's photograph from a photographic array is not a critical stage. The question we must answer is whether Tovar's 1997 identification of Gallo-Moreno is more like the lineup in *Wade* or more like the photo array in *Ash*.

We begin with *Wade*'s conclusion that defense counsel is required at a postindictment lineup. In reaching this conclusion, the Court explained that a "critical stage" is "any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial." *Wade*, 388 U.S. at 226. The Court read its Sixth Amendment precedents to require that it

> scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have

> effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

*Id.* at 227. Using this approach, the Court held that a postindictment lineup requires counsel's presence because lineups are "peculiarly riddled with innumerable dangers and variable factors which might seriously, even crucially, derogate from a fair trial." *Id.* at 228. In particular, the Court observed that "neither witnesses nor lineup participants are apt to be alert for conditions prejudicial to the suspect," *id.* at 230, and the "presence of counsel itself can often avert prejudice and assure a meaningful confrontation at trial," *id.* at 236.

*Wade* contrasted a postindictment lineup with "mere preparatory step[s] in the gathering of the prosecution's evidence, . . . such as systematized or scientific analyzing of the accused's fingerprints, blood sample, clothing, hair, and the like." *Id.* at 227. These preparatory steps are not critical stages because "[k]nowledge of the techniques of science and technology is sufficiently available, and the variables in techniques few enough, that the accused has the opportunity for a meaningful confrontation of the Government's case at trial through the ordinary processes of cross-examination of the Government's expert witnesses and the presentation of the evidence of his own experts." *Id.* at 227-28. In other words, the absence of counsel during these steps does not present sufficient risk of "derogat[ing] from [a defendant's] right to a fair trial." *Id.* at 228.

A few years after *Wade* the D.C. Circuit was asked to decide whether the presence of counsel was required at a postindictment identification procedure involving the presentation to a witness of the defendant's photograph in a photographic array. The D.C. Circuit concluded that this identification procedure was a critical stage of criminal proceedings requiring counsel under *Wade*. *United States v. Ash,* 461 F.2d 92, 100-01 (D.C. Cir. 1972), *rev'd,* 413 U.S. 300 (1973). *Wade* had focused on the possibility of mistaken identification, and the D.C. Circuit concluded in *Ash* that photo-array procedures were as susceptible as lineups to mistaken identification.[2]

---

[2] More fully, the D.C. Circuit held:

> [T]he dangers of mistaken identification from uncounseled lineup identifications set forth in *Wade* are applicable in large measure to photographic as well as corporeal identifications. These include, notably, the possibilities of suggestive influence or mistake—particularly where witnesses had little or no opportunity for detailed observation during the crime; the difficulty of reconstructing suggestivity—even greater when the defendant is not even present; the tendency of a witness's identification, once given under these circumstances, to be frozen. While these difficulties may be somewhat mitigated by preserving the photograph shown, it may also be said that a photograph can preserve the record of a lineup; yet this does not justify a lineup without counsel. The same may be said of the opportunity to examine the participants as to what went on in the course of the identification, whether at lineup or on photograph. Sometimes this may suffice to bring out all pertinent

(continued...)

The Supreme Court reversed the D.C. Circuit's decision in *Ash* and held that a postindictment witness identification of a defendant's photograph from a photo array did not constitute a critical stage of criminal proceedings. The Court first concluded that the D.C. Circuit's analysis had been incomplete. The Court clarified that *Wade* did not stand for the proposition that "the dangers of mistaken identification" are alone "a sufficient basis for requiring counsel." *Ash*, 413 U.S. at 314. Instead, the Court explained, *Wade* had considered the dangers of misidentification only *after* concluding that a "lineup constituted a trial-like confrontation, requiring the 'Assistance of Counsel' to preserve the adversary process by compensating for advantages of the prosecuting authorities." *Id.*; *accord id.* ("The similarity to trial [in *Wade*] was apparent, and counsel was needed to render 'Assistance' in counterbalancing any 'overreaching' by the prosecution.").

The Supreme Court also observed that "[a]fter . . . *Wade* held that a lineup constituted a trial-like confrontation requiring counsel, a more difficult issue remained in the

---

(...continued)

facts, even at a lineup, but this would not suffice under *Wade* to offset the constitutional infringement wrought by proceeding without counsel. The presence of counsel avoids possibilities of suggestiveness in the manner of presentation that are otherwise ineradicable.

*United States v. Ash*, 461 F.2d 92, 100-01 (D.C. Cir. 1972), *rev'd*, 413 U.S. 300 (1973).

case for consideration," namely, whether the Court's holding necessarily meant that other preparatory steps in acquiring evidence from the defendant—e.g., the taking of fingerprints or blood samples—also required the presence of counsel. *Id.* The Court noted that *Wade* had specifically "recognized that there were times when the subsequent trial would cure a one-sided confrontation between prosecuting authorities and the uncounseled defendant. In other words, such stages were not 'critical.'" *Id.* at 315. On this point, the Court held in *Ash* that the

> lack of scientific precision and inability to reconstruct an event . . . [are] the tests to determine whether confrontation with counsel at trial can serve as a substitute for counsel at the pretrial confrontation. If accurate reconstruction is possible, the risks inherent in any confrontation still remain, but the opportunity to cure defects at trial causes the confrontation to cease to be "critical."

*Id.* at 316.

Applying these principles, the Court concluded that defense counsel need not be present for a witness's identification of the defendant's photograph from a photo array. The Court emphasized that the defendant was not physically present at such an identification procedure and noted that a routine postindictment interview of a witness for purposes of making a photo identification "was not analogous to an adversary trial." *Id.* at 317. The Court also observed that the defense could interview the government's witnesses for itself and administer its own photographic-identification procedure, and thus

the "adversary mechanism remains as effective for a photographic display as for other parts of pretrial interviews." *Id.* at 318. Accordingly, the Court was "not persuaded that the risks inherent in the use of photographic displays are so pernicious that an extraordinary system of safeguards is required." *Id.* at 321.

Reconciling *Wade* and *Ash* presents several interpretive problems. For one, *Ash* endorses *Wade*'s result, but it appears to rest that result on a different foundation. *See id.* at 324 n.* (Stewart, J., concurring in judgment) ("I do not read *Wade* as requiring counsel because a lineup is a 'trial-type' situation . . . . Rather, I had thought the reasoning of *Wade* was that the right to counsel is essentially a protection for the defendant at trial, and that counsel is necessary at a lineup in order to ensure a meaningful confrontation and the effective assistance of counsel at trial."); *see also United States v. Byers*, 740 F.2d 1104, 1117 (D.C. Cir. 1984) (en banc) (plurality opinion) (Scalia, J.) ("As we later learned, however, [our] interpretation of *Wade* was mistaken—or in any event superseded [by *Ash*].").

In addition, the basis of the Court's holding in *Ash* is somewhat unclear. *Ash* did not ground its rationale solely on the likelihood that a pretrial photo array could be accurately reconstructed; if that were sufficient, the Court could have reversed the D.C. Circuit simply by saying that the preservation of the photographs in an objective record was the distinguishing factor between *Ash* and *Wade*. If the ability to reconstruct the identification procedure were all that mattered, then *Ash*'s

repeated emphasis on the presence of a "trial-like confron-tation" would have been extraneous, *see Ash*, 413 U.S. at 310, 312, 314, 316-18, as would the Court's statement that *Wade* considered the possibility of mistaken iden-tifications only *after* concluding that the pretrial con-frontation was sufficiently trial-like.

Another conundrum in *Ash* is that although the Court concluded that "the risks inherent in the use of photo-graphic displays are [not] so pernicious that an extraordi-nary system of safeguards is required," *id.* at 321, the Court offered little guidance on how to draw this line. The Court suggested that pretrial lineups "normally" cannot be "[d]uplica[ted]," while photographic arrays can be. *Id.* at 318 n.10. But lineups can be and often are photo-graphically recorded and are therefore as amenable to "reconstruction" at trial as a photo array.

Reconciling *Ash* and *Wade* as best we can, we see two general principles at work. First, for a postindictment identification procedure to trigger a potential Sixth Amendment right to counsel, the defendant must be present in a trial-like confrontation "by the procedural system, or by his expert adversary, or by both*." Id.* at 309; *see also Moore v. Illinois*, 434 U.S. 220, 227 n.3 (1977) (ex-plaining the distinction between *Wade* and *Ash* in part by stating that "[a] photographic showing, unlike a corpo-real identification, is not a 'trial-like adversary confronta-tion' between an accused and agents of the government"). Second, the defendant must not be able to "cure" the uncounseled confrontation through counsel at trial.

Both *Ash* and *Wade* explained that any flaws in an uncounseled "trial-like" pretrial confrontation are curable when accurate reconstruction is possible or when scientific testing can expose the defects in the government's evidence. And although the Supreme Court did not offer other examples of curable confrontations, we do not think the Court meant to provide an exhaustive list. Indeed, in *United States v. Infelice*, 506 F.2d 1358 (7th Cir. 1974), which was issued shortly after *Ash* was issued, we concluded that a witness identification based entirely on an accurately preserved audio recording did not implicate Sixth Amendment right-to-counsel concerns. In *Infelice*, an officer had "overheard" a conspirator's voice on a tape of the crime and later arrested the defendant. *Id.* at 1367. In the process of the arrest, the officer delivered *Miranda* warnings, the defendant responded that he understood his rights, and the officer immediately recognized the defendant's voice as the conspirator's based on having heard it on the tape. We held that the identification had not occurred during a critical stage of the criminal proceedings because "[t]he conversation on which [the officer] based his identification was preserved on tape which eliminated the risk of unintentional suggestion and impediments to confrontation at trial." *Id.* at 1365.

Although the analysis in *Infelice* was brief, its holding applies here. When a witness makes an identification based on hearing a defendant's recorded voice on tape and that tape is preserved in the record, the defendant can adequately challenge the witness's voice identification at trial through effective cross-examination. True,

there is some possibility of undue influence on the witness at the time of the pretrial identification, but that is also the case with photo arrays, and the Court none-theless held in *Ash* that a photo-array identification is not a critical stage of criminal proceedings requiring the presence of counsel. In any event, the teaching of *Wade* and *Ash*—read together—appears to be that the potential for abuse in the absence of counsel should be weighed against the defendant's ability to contest the witness's identification through counsel at trial, and when the identification is based on a tape recording, the defendant is sufficiently able to confront the identification witness at trial.[3]

Applying these principles to this case, we conclude that Tovar's voice identification did not occur at a critical stage of the criminal proceedings requiring the presence of counsel. Assuming the identification occurred in a trial-like confrontation, any flaws or overreaching in the identification were curable by defense counsel at trial. We see no meaningful distinction between this case and *Infelice*. Tovar's identification of Gallo-Moreno was based solely on his study of Carrion's voice on the tapes; he did not link Gallo-Moreno to Carrion based on his recollection of his participation in the 1994 drug investigation. The tapes were preserved and in evidence,

---

[3] For similar holdings, see *United States v. Oriakhi*, 57 F.3d 1290, 1299 (4th Cir. 1995); *United States v. Thomas*, 586 F.2d 123, 134 (9th Cir. 1978); and *United States v. Woods*, 544 F.2d 242, 263 (6th Cir. 1976).

and as such, Gallo-Moreno could adequately challenge Tovar's identification at trial. Gallo-Moreno could—and did—call other witnesses to offer different voice identifications after hearing the tapes. And he could have asked the trier of fact to make an independent evaluation, after listening to the evidentiary tapes and the voice exemplars, about whether the two voices were the same. Although counsel was not present at Tovar's initial voice identification of Gallo-Moreno as Carrion, any flaws inherent in that identification could be cured at trial. Accordingly, the identification did not occur at a critical stage of criminal proceedings, and there was no violation of Gallo-Moreno's Sixth Amendment rights.

AFFIRMED.